# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-10598

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

      Plaintiff–Appellee,

v.

EMCARE, INCORPORATED,

      Defendant–Appellant.

United States Court of Appeals
Fifth Circuit

**FILED**

May 19, 2017

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Northern District of Texas

Before SMITH, PRADO, and GRAVES, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Following a six-day trial, a jury found that EmCare, Inc. ("EmCare") terminated three employees in retaliation for complaining of sexual harassment in the workplace. The district court denied EmCare's motion for judgment as a matter of law. EmCare appeals the judgment with respect to one employee, Luke Trahan. Specifically, EmCare contends that the Equal Employment Opportunity Commission ("EEOC") failed to present sufficient evidence of a causal link between Trahan's protected activity and termination because there was no evidence that the individual who decided to terminate Trahan was aware he had engaged in protected activity. Because we find there was sufficient evidence to support the jury's verdict, we AFFIRM.

No. 16-10598

## I. BACKGROUND

Trahan worked for EmCare's AnesthesiaCare division from November 2008 to August 7, 2009. EmCare provides physicians as well as physician management services to hospitals and emergency centers. Trahan was hired as a physician recruiter but was quickly promoted to recruiting manager. During his time at EmCare, Trahan headed the credentials and billing enrollment teams. At the time, AnesthesiaCare had only recently been acquired by EmCare, and one of Trahan's responsibilities was updating and editing provider contracts to reflect the acquisition. For the first few months of his employment, Trahan was supervised by Jim McKinney, the CEO of AnesthesiaCare. Sean Richardson, the chief operating officer, became Trahan's supervisor in April 2009. The other characters in this case include: Karen Thornton, EmCare's vice president for human relations and head of AnesthesiaCare's human resources ("HR") office; Lewis Johnson, AnesthesiaCare's HR manager; Gloria Stokes, McKinney's executive assistant; Yvonne Shaw, a senior credentialing coordinator; and Ken Thompson, another credentialer. Johnson spoke to Thornton every day, and Thornton testified that Johnson reported to her, that the two spoke every day, and that Johnson would have made her aware of any complaint made by an AnesthesiaCare employee regarding sexual harassment.

This case arises from McKinney's frequent and persistent sexual remarks and gestures in the workplace. At trial, numerous witnesses testified to various examples of the following conduct: McKinney constantly commented on women's bodies, asking them to lower their blouses, hike up their skirts, show more cleavage, or turn around, he often referred to the size of women's breasts, made groping gestures, and sought intimate hugs, he made inappropriate comments about his employees' wives, and he offered commentary on which female employees he regarded as "hott[ies]." One

2

AnesthesiaCare employee told the EEOC investigator that she called McKinney "the boob man" because he commented on women's breasts so frequently. Both Trahan and Shaw testified that Thornton and Johnson were occasionally present for McKinney's comments but never reprimanded McKinney. Furthermore, Shaw testified that Richardson heard at least one offensive comment and stated "one day" McKinney would "get [them] in trouble."

Trahan, Shaw, and Stokes all testified that they complained to Thornton and/or Johnson about McKinney's behavior and the work environment it created, but that they never heard of any investigative or remedial action taken by EmCare. In addition, Trahan testified that every time he complained to HR about McKinney, "McKinney would tell him shortly thereafter that he 'needed to shape up and do things better'" but would not point out any deficiencies when Trahan asked for specifics.

The situation took a turn for the worse in June 2009, when AnesthesiaCare hosted a "Bring Your Child to Work Day" ("BYCTW Day"). Shaw brought her fifteen-year-old daughter to the office. She testified that when she introduced her daughter to McKinney, McKinney stated, "[T]here is no way she is 15 with breasts like that." Shaw recalled that McKinney laughed when Shaw became visibly upset. She then went to HR to complain, accompanied by Trahan and Thompson. At this point in his employment, Trahan had already complained to HR at least four times about McKinney's behavior. Johnson, who appeared distressed by their account, told them to submit a formal complaint. Trahan did so that day.

In July, Thornton suggested that Trahan's and Shaw's units be audited. An employee from EmCare's management services audited Trahan's unit and summarized her findings to Richardson. The reported listed several problems with the unit's performance that were caused by the failures of a regional vice

president, an issue that Trahan had already reported to Richardson. Nonetheless, the report was essentially positive regarding Trahan's performance, particularly as it compared to that of another recruiter who did not get fired. Trahan never received any feedback from his superiors about the audit. On August 7, 2009—six weeks after BYCTW Day and four days after Richardson received the audit report—EmCare fired the three employees who had complained on BYCTW Day: Trahan, Shaw, and Thompson. Thornton and Richardson met with Trahan and told him he was being terminated because "it was [not] working anymore." Richardson testified that it was his decision to terminate Trahan, but acknowledged that he discussed the decision with Thornton and McKinney beforehand. Thornton entered Trahan's termination into the computer database, which she only did when there was a "backlog or if [she] was personally involved in the transaction."

EmCare maintains that Trahan was fired due to the "quality of his work and inaccuracies in his contracts." Both parties acknowledge that in December 2008, shortly after Trahan began his employment, numerous errors arose with regard to some of the company's contracts in El Paso. Trahan characterized the mistakes as the result of a computer glitch and testified that he resolved the issue in a timely manner. EmCare concedes that the mistakes were corrected and no business was lost but maintains that the incident caused McKinney to become very upset and was part of an "ongoing problem" with Trahan's performance. At trial, Richardson testified that Trahan had difficulty editing contracts, Trahan was verbally counseled at certain times to improve his performance, and the audit performed following BYCTW Day was "not a complimentary review."

By contrast, Trahan asserted that the limited feedback he received at EmCare was positive. In February 2009, Trahan was given a 90-day performance review during which McKinney told him to keep doing what he

No. 16-10598

was doing—a statement that was repeated to him by Richardson as late as mid-July. According to Trahan, the only concrete example of a performance issue he was made aware of was the incident with the El Paso contracts.[1]

The EEOC filed suit in federal district court on August 15, 2011, seeking injunctive relief and monetary damages under Title VII on behalf of Gloria Stokes, Luke Trahan, and Yvonne Shaw. The EEOC alleged that Stokes had been subjected to a hostile work environment based on her sex and fired in retaliation for her complaints; likewise, it alleged that Trahan and Shaw were terminated in retaliation for their complaints about McKinney's behavior. EmCare did not seek dismissal or summary judgment, and in October 2014, the case proceeded to a six-day jury trial. The jury found in favor of the EEOC and awarded $167,000 in back pay for Trahan, $82,000 in back pay for Shaw, and $250,000 in punitive damages for Stokes.

The district court denied EmCare's renewed motion for judgment as a matter of law and motion for a new trial. Shaw and Stokes have settled their claims. EmCare appealed the judgment in favor of Trahan.

## II. STANDARD OF REVIEW

This Court "review[s] the denial of a motion for judgment as a matter of law *de novo*, . . . apply[ing] the same legal standard as the district court." *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013) (en banc). Judgment as a matter of law is appropriate if the Court finds no "legally sufficient evidentiary basis" to support the jury's verdict. Fed. R. Civ. P. 50(a)(1). But "if reasonable persons could differ in their interpretations of the evidence, then the motion should be denied." *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 475 (5th Cir. 2005) (quoting *Thomas v. Tex. Dep't of Criminal Justice*, 220 F.3d

---

[1] Similarly, Shaw and Thompson testified that no supervisor ever criticized their performance until they were fired.

5

389, 392 (5th Cir. 2000)). "[W]hen evaluating the sufficiency of the evidence, we view all evidence and draw all reasonable inferences in the light most favorable to the verdict." *Id.* This Court is "especially deferential" to jury verdicts; the verdict should be affirmed "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Boh Bros.*, 731 F.3d at 451 (internal quotation marks omitted) (quoting *SMI Owen Steel Co. v. Marsh U.S.A., Inc.*, 520 F.3d 432, 437 (5th Cir. 2008) and *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 498 (5th Cir. 2012)).

## III. DISCUSSION

To prove retaliation under Title VII, the plaintiff must establish: "(1) the employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action." *Thomas*, 220 F.3d at 394. When there has been a trial on the merits, however, a court can bypass "the familiar *McDonnell Douglas* burden-shifting" analysis and "proceed to the ultimate question of whether the plaintiff presented enough evidence for a jury to find that [retaliation] occurred." *Zamora v. City of Houston*, 798 F.3d 326, 333 (5th Cir. 2015) (alteration in original) (quoting *Thomas*, 220 F.3d at 393). EmCare acknowledges that Trahan engaged in protected activity—making complaints to HR—and that he was terminated. Accordingly, the only issue on appeal is whether the EEOC presented legally sufficient evidence of a causal link between Trahan's complaints and his termination.

"[T]o establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity." *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir. 2003). Generally, this requires some showing that the decisionmaker—the individual

"who actually made the decision or caused the decision to be made"—was aware of the activity. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000). A decisionmaker's awareness may be established by circumstantial evidence. *See Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). Resting its argument on this narrow issue, EmCare maintains that there is no evidence Sean Richardson, the person who decided to terminate Trahan, was aware of Trahan's complaints. Thus, EmCare implicitly makes two claims: (1) there is no evidence that Richardson knew about Trahan's complaints and (2) there is no evidence that anyone other than Richardson decided to fire Trahan. EmCare characterizes the evidence on these points as uncontroverted and unequivocally established at trial.

EmCare contends that any evidence suggestive of Richardson's knowledge amounts to speculation. Demonstrating that a decisionmaker was aware of an employee's protected activity certainly requires "more evidence than mere curious timing coupled with speculative theories." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997). For example, we have found that evidence of generalized discussions between a decisionmaker and someone with knowledge of the plaintiff's protected activity creates only a speculative inference regarding the decisionmaker's awareness. *See Lee v. Kan. City S. Ry.*, 574 F.3d 253, 258 (5th Cir. 2009); *Turner v. Jacobs Eng'g Grp., Inc.*, 470 F. App'x 250, 253 (5th Cir. 2012) (per curiam). And if the plaintiff fails to produce any evidence that a decisionmaker was aware of the protected activity, judgment as a matter of law should be granted. *See Bain v. Ga. Gulf Corp.*, 462 F. App'x 431, 433–34 (5th Cir. 2012) (per curiam) (crediting the sole decisionmaker's testimony that he had no knowledge of protected activity when the plaintiff did not present any evidence to the contrary); *Lopez v. Martinez*,

240 F. App'x 648, 650 (5th Cir. 2007) (per curiam) (noting that the plaintiff "presented no evidence establishing the superior's knowledge").

This case does not involve mere speculation. As an initial matter, there was an abundance of conflicting testimony over critical issues, entitling the jury to discredit Richardson's and Thornton's versions of events and find their testimony not credible. For example, the jury heard conflicting accounts regarding: whether Thornton and Richardson ever personally observed McKinney make sexually offensive comments, whether Trahan and Shaw ever complained to HR about McKinney's behavior, and whether the audit of Trahan's unit produced any legitimate grounds to fire him. Accordingly, the jury was entitled to find that Richardson and Thornton had both witnessed inappropriate behavior in the workplace and taken no action, that Trahan and other employees complained to HR numerous times, and that the justification for firing Trahan was pretextual.

In light of these contradictory statements, as well as the circumstances surrounding Trahan's termination, the evidence was sufficient for the jury to find that Richardson was aware of Trahan's complaints.[2] More specifically, Trahan testified that McKinney would criticize Trahan whenever he complained, allowing the jury to infer, at the very least, that McKinney knew about the complaints. Given that both McKinney and Richardson were executives and supervisors in the same division, Richardson could have been given the same information. The jury could also have logically inferred that

---

[2] Notably, ample additional evidence presented at trial supports causation, including: the timing of Trahan's firing (approximately six weeks after the complaint on BYCTW Day); the fact that the three employees who complained together were all fired the same day; testimony suggesting the explanations given for Trahan's termination were pretextual; and evidence related to Shaw and Stokes that may have overlapped with Trahan's testimony. Because EmCare's entire argument is based on Richardson's lack of knowledge, we focus on evidence relevant to that specific issue. Nonetheless, we are mindful of the totality of evidence from which the jury drew its inferences.

No. 16-10598

Thornton told Richardson about the complaints when they discussed Trahan's performance and termination. Unlike the conversations in *Lee* and *Turner*, these were not general discussions about an employee; Thornton and Richardson specifically discussed Trahan's performance before and after the audit. *See Lee*, 574 F.3d at 258; *Turner*, 470 F. App'x at 253.

In addition—or alternatively—there was sufficient evidence for the jury to find that Thornton and Richardson both made the decision to fire Trahan.[3] A decisionmaker is an individual "who actually made the decision or caused the decision to be made." *Russell*, 235 F.3d at 227. Here, it was Thornton's idea to audit Trahan in 2009, shortly after Trahan made the complaint on BYCTW Day. Those audits were used to justify his firing. Richardson discussed terminating Trahan with Thornton before he did so, and Thornton was present when Trahan was fired. She was also the person who entered his termination into the company computer system, even though that was not her usual practice. Indeed, Thornton testified that she entered terminations into the system only if there was "a backlog or if [she] was personally involved in the transaction." Any inference by the jury that Thornton was a decisionmaker or caused the decision to be made would not have been speculative.

## IV. CONCLUSION

The district court did not err in denying EmCare's motion for judgment as a matter of law. Because the jury could have logically inferred either that Richardson knew of Trahan's complaints or that Thornton was involved

---

[3] EmCare accuses the EEOC of using a "cat's paw theory" to prove causation. Plaintiffs may use a cat's paw theory to prove causation when they cannot show the official decisionmaker had a retaliatory motive, but can show that another individual influenced that decisionmaker. *Zamora*, 798 F.3d at 331. However, the EEOC does not raise a cat's paw argument, and we do not need to decide whether cat's paw causation applies. The jury could have found that Thornton was actually involved in the decision to fire Trahan.

in the decision to fire Trahan, the EEOC presented sufficient evidence of causation. Accordingly, we AFFIRM the judgment in favor of the EEOC.