

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-16-00198-CR

CHRISTIAN VERNON SIMS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 26338

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Chief Justice Morriss

OPINION

Early in the afternoon of December 18, 2014, the body of Annie Sims was discovered on the back porch of her Powderly, Texas, home with a bullet in her head. Missing were Annie's live-in grandson, Christian Vernon Sims (Sims), his girlfriend, Ashley Morrison, Annie's vehicle, and Annie's purse, its contents including credit cards and at least one handgun. Officers suspected that the missing couple caused Annie's death and had taken the missing items from Annie's house. The officers' investigation was assisted by Sims' grandfather and Annie's husband, Mike Sims, as well as Sims' father, Matt.

Sims and Morrison were identified as having charged on Annie's credit card in McAlester, Oklahoma, shortly before the discovery of Annie's body. Starting around 5:00 p.m. that evening and without a warrant, officers had Sims' mobile carrier "ping" or track Sims' cellular telephone[1] by using information from cell towers along a highway in Oklahoma, Sims' northerly path of travel. Using the tracking data, officers learned, first, that Sims' cell phone was somewhere on that northbound highway, north of McAlester, and, later, at a Sapulpa, Oklahoma, truck stop located further north along the same highway. Oklahoma officers soon located Annie's vehicle in the parking lot of a motel across the highway from the truck stop. Armed with the license number from the vehicle, officers learned from the motel desk clerk that Sims and Morrison had rented room 275 in that motel. From that room, both suspects were arrested peacefully at approximately

---

[1]Although Sims' cellular telephone used an account in the name of Mike Sims, the phone itself was purchased, possessed, and used only by Sims. The limited information Mike had the authority or ability to obtain, regarding Sims' cell phone use, did not include any content of communications or "substantive text messages, photos, or any other electronic – detailed electronic information from the provider." There is no claim that this special arrangement compromised any rights of Sims in the information concerning the phone's use or location.

8:25 p.m. At the motel, without being questioned, Sims told officers, among other things, "[Morrison] had nothing to do with it. It was all me."

After the denial of Sims' various motions to suppress evidence, he and the State entered into a plea agreement, under which Sims pled guilty to Annie's murder and was sentenced to thirty-five years' imprisonment. Having retained the right to appeal the denial of his motions to suppress and urging that at least one of his motions was erroneously denied, making Sims' plea of guilty allegedly involuntary, Sims appeals in three points of error. In the first two points, Sims claims that evidence discovered as a result of the warrantless "pinging" of his cellular telephone should have been suppressed because it both constituted a constitutionally unreasonable search and violated state and federal statutes. In his third point, Sims argues that the trial court should have also suppressed evidence discovered from the later, warrant-based, searches of his cellular telephone and Facebook account because the warrant affidavits were insufficient. Sims posits that, because he pled guilty only after his various motions to suppress had been denied, his conviction and sentence should be reversed and the case remanded to the trial court for further proceedings.

We affirm the trial court's judgment because (1) violations of the Federal Stored Communication Act (SCA) and of Article 18.21 of the Texas Code of Criminal Procedure do not require suppression of the evidence discovered thereby, (2) there was no constitutional violation from this reasonable search in pinging Sims' cell phone, and (3) the affidavits for the search warrants for Sims' cellular telephone data and his Facebook account data support the trial court's findings of probable cause.

3

*(1)    Violations of the Federal Stored Communication Act and of Article 18.21 of the Texas Code of Criminal Procedure Do Not Require Suppression of the Evidence Discovered Thereby*

Sims argues that the warrantless pinging of his cellular telephone to locate him, as he and Morrison travelled north through Oklahoma, violated both the Federal SCA and its counterpart Texas statute, requiring suppression of all evidence discovered as a result of the pinging. *See* 18 U.S.C. § 2702 (2015), § 2703 (2009); TEX. CODE CRIM. PROC. ANN. art. 18.21 (West Supp. 2016).

We "review the trial court's legal rulings [on motions to suppress] de novo." *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006); *see Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). The State argues that suppression of evidence is not a remedy available to Sims under either the state or the federal statute and directs us to the very recent case *United States v. Wallace*, 857 F.3d 685 (5th Cir. 2017). We agree that suppression is not a remedy for a non-constitutional violation of either statute.

The federal statute at issue here is the SCA, which is Title II of the Electronic Communications Privacy Act of 1986, as amended. *See* 18 U.S.C. §§ 2701–12 (SCA); *see also* Pub. L. No. 99–508, 100 Stat. 1848 (1986) (ECPA).[2] The SCA sets out terms under which government entities, including law enforcement agencies, may obtain disclosure of information from providers of electronic communications services, including mobile telephone carriers. *See* 18 U.S.C. § 2703.[3] Without providing any exclusionary rule, the SCA provides for civil actions

---

[2]For a helpful explanation of the components of the federal statutory scheme, *see United States v. McGuire*, No. 2:16-CR-00046-GMN-PAL, 2017 WL 1855737, at *5 (D. Nev. Feb. 9, 2017).

[3]"The plain language of 18 U.S.C. § 2703(c) states that the government may obtain 'a court order' requiring a cellular telephone company to turn over 'record[s] or other information' related to its 'customer[s].'" *Wallace*, 857 F.3d at 691.

4

for violations of its terms and makes the "remedies and sanctions described in this chapter" exclusive. *See* 18 U.S.C. §§ 2707 (civil actions), 2708 (exclusivity of remedies).[4]

Parallel to the SCA is Article 18.21 of the Texas Code of Criminal Procedure, which sets out its terms for disclosure, provides for civil actions, but no exclusion of evidence, for its violation, and states that "[t]he remedies and sanctions described in this article are the exclusive judicial remedies and sanctions for a violation of this article other than a violation that infringes on a right of a party guaranteed by a state or federal constitution." *See* TEX. CODE CRIM. PROC. art. 18.21, §§ 4–5B (terms for disclosure), § 12 (cause of action), § 13 (exclusivity of remedies).

Therefore, suppression is not available to criminal defendants based on a violation of the SCA or of Article 18.21, so long as the violation is not also a violation of a constitutional right. *Wallace*, 857 F.3d at 689; *United States v. Guerrero*, 768 F.3d 351, 358 (5th Cir. 2014), *cert. denied*, 135 S.Ct. 1548 (2015); *United States v. German*, 486 F.3d 849, 854 (5th Cir. 2007); *see Love v. State*, No. AP-77,024, 2016 WL 7131259, at *7 n.8 (Tex. Crim. App. Dec. 7, 2016) (to suppress evidence for violation of SCA or Article 18.21, court must find constitutional violation).

Sims argues that, by its explicit terms, Article 38.23 of the Texas Code of Criminal Procedure requires suppression in this case:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

---

[4]Section 2708 provides, "The remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter." 18 U.S.C. § 2708.

5

TEX. CRIM. PROC. CODE ANN. art. 38.23(a) (West 2005). Understandably, Sims reasons that a violation of either the federal or the state statute requires, under Article 38.23(a), exclusion of the evidence. We disagree, because of the rule of statutory construction that the specific should control the general in case of an irreconcilable conflict. While Article 38.23 clearly requires exclusion in the general case of a statutory or constitutional violation, the federal and state statutes specifically applicable to the pinging of Sims' cell phone say that suppression is not available. Here, the specific exclusivity of remedies in the two statutes control the general terms of Article 38.23. *See Burke v. State*, 28 S.W.3d 545, 547 (Tex. Crim. App. 2000); *Mills v. State*, 722 S.W.2d 411, 413–14 (Tex. Crim. App. 1986); *Davidson v. State*, 249 S.W.3d 709, 721 (Tex. App.—Austin 2008, pet. ref'd); *see also Love*, 2016 WL 7131259, at *7 n.8.

We therefore overrule this point of error. Only if there was a constitutional violation should the trial court have suppressed the evidence found from pinging Sims' cell phone.

*(2)*     *There Was No Constitutional Violation from this Reasonable Search in Pinging Sims' Cell Phone*

Sims also asserts that the State's warrantless use of the third-party data pertaining to the location of his cellphone was an unreasonable search in violation of the federal and state Constitutions. *See* U.S. CONST. amend IV; TEX. CONST. art. 1, § 9. We disagree.[5]

Only in certain circumstances might an individual have a legitimate expectation of privacy in third-party information concerning the location of that individual's cell phone. In discussing

---

[5]The Texas Constitution does not reach further than the Fourth Amendment to the United States Constitution in situations in which the State is attempting to acquire an appellant's cell phone records from a third party. *Holder v. State*, No. 05-15-00818-CR, 2016 WL 4421362, at *13 (Tex. App.—Dallas Aug. 19, 2016, pet. granted); *see Hankston v. State*, 517 S.W.3d 112, 121–22 (Tex. Crim. App. 2017).

6

the subject, courts have considered that location information can be of three basic types, (a) real-time tracking information, (b) intermediate-term information, and (c) long-term location information. They suggest that the safest, least controversial type of data is the intermediate-term information. For example, Texas precedent is that there is no legitimate expectation of privacy in four days' cell phone location information obtained from the carrier. *Ford v. State*, 477 S.W.3d 321, 334–35 (Tex. Crim. App. 2015).

Longer term, pattern data showing places an individual visits over an extended period of time is suspect, in that individuals may very well have legitimate expectations of privacy in such data, which maps out the patterns of their daily lives. Five Justices of the United States Supreme Court have agreed that "longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." *See United States v. Jones*, 565 U.S. 400, 414 (Sotomayor, J., concurring), 431 (Alito, J., concurring in the judgment) (2012); *see Ford*, 477 S.W.3d at 332.

The third type of data, real-time, tracking data, such as is the data used here, has been debated among the courts.

> [M]any federal courts that have considered the issue have concluded that "real-time" location information may be obtained only pursuant to a warrant supported by probable cause. *See In re Application for Pen Register and Trap/Trace Device with Cell Site Location Authority*, 396 F. Supp. 2d 747 (S.D. Tex. 2005). Some states, too, require a warrant for real-time cell-site-location data[—]either under the Fourth Amendment, a state constitution, or a state statute. *See*, *e.g.*, *In Tracey v. State*, 152 So.3d 504, 526 (Fla. 2014) (Fourth Amendment); *State v. Earls*, 214 N.J. 564, 70 A.3d 630, 644 (N.J. 2013) (New Jersey Constitution); 725 ILL. COMP. STAT. 168/10; IND. CODE 35–33–5–12; MD. CODE ANN. CRIM. PROC. § 1–203.1(B); VA. CODE ANN. § 19.2–70.3(C).

*Ford*, 477 S.W.3d at 335 n.18. But, while there may be a legitimate expectation of privacy in real-time tracking data in *private* locations, the same tracking, when following a subject in *public*

places, does not invade legitimate expectations of privacy. Where such surveillance took place on public highways, there was no legitimate expectation of privacy. *United States v. Forest*, 355 F.3d 942, 951–52 (6th Cir. 2004), *vacated on other grounds*, *Garner v. United States*, 543 U.S. 1100 (2005) (reasoning that federal agents' action in calling defendant's cell phone and hanging up before it rang in order to "ping" defendant's physical location was not search under Fourth Amendment, as it was possible for any member of public to view defendant's car) (citing *United States v. Knotts*, 460 U.S. 276, 281 (1983) ("A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.")). "Fourth Amendment concerns might be raised . . . if real-time location information were used to track the present movements of individuals in *private* locations . . . . *Ford*, 477 S.W.3d at 334 (emphasis added).

Here, the real-time tracking data appears to have been used to track Sims to exclusively public places—a public highway between McAlester and Sapulpa, Oklahoma, and a public parking lot of a Sapulpa truck stop, across the highway from the motel in which Sims and Morrison were ultimately found. We conclude that Sims did not have a legitimate expectation of privacy of the location of his cell phone in those locations. Therefore, there was no Fourth Amendment violation in that regard. *Id.* We overrule this point of error.

8

*(3)      The Affidavits for the Search Warrants for Sims' Cellular Telephone Data and His Facebook Account Data Support the Trial Court's Findings of Probable Cause*

Sims argues that evidence from the later searches of his cell phone and of his Facebook account should have been suppressed because the supporting affidavits are insufficient to establish probable cause. We disagree.

When reviewing whether a warrant affidavit supports a finding of probable cause, we do not consider facts in isolation, but examine the affidavit(s) from the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983); *Rodriguez v. State*, 232 S.W.3d 55, 59–60 (Tex. Crim. App. 2007). In determining whether an affidavit provides probable cause to support a search warrant, an issuing court and a reviewing court are constrained to the four corners of the affidavit. *Taunton v. State*, 465 S.W.3d 816, 822 (Tex. App.—Texarkana 2015, pet. ref'd). We must examine the supporting affidavit to see if it recited facts sufficient to support conclusions (1) that a specific offense was committed, (2) that the property or items to be searched for or seized constitute evidence of the offense or evidence that a particular person committed it, and (3) that the evidence sought is located at or within the thing to be searched. TEX. CODE CRIM. PROC. ANN. art. 18.01(c) (West Supp. 2016); *Taunton*, 465 S.W.3d at 822. We examine the affidavits for recited facts "sufficient to justify a conclusion that the object of the search is probably [within the scope of the requested search] at the time the warrant is issued." *State v. Delagarza*, 158 S.W.3d 25, 26 (Tex. App.—Austin 2005, no pet.). We review "the combined logical force of facts that are in the affidavit." *Taunton*, 465 S.W.3d at 822; *Rodriguez*, 232 S.W.3d at 62.

> Affidavits for arrest or search warrants should be interpreted in a "common sense and realistic manner," and once a magistrate has found probable cause, warrants should not thereafter be invalidated through a "hypertechnical" interpretation of

9

> their supporting affidavits.  *Illinois v. Gates*, 462 U.S. 213, 236 . . . (1983); *Crider v. State*, 352 S.W.3d 704, 707 (Tex. Crim. App. 2011).  We will sustain the issuance of the warrant if "the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing."  *Gates*, 462 U.S. at 236 . . . (quoting *Jones v. United States*, 362 U.S. 257, 271 . . . (1960)); *see Swearingen*, 143 S.W.3d at 811.

*Taunton*, 465 S.W.3d at 821–22.

Sims urges us to follow our opinion in *Taunton* and find that the affidavits here were insufficient.  But there are significant differences between the *Taunton* affidavits and those related to the searches of Sims' cell phone and Facebook data.  The *Taunton* affidavits failed to disclose any evidence that tied Taunton to the crimes that those affidavits described, any relationship between Taunton and the victims, or any information on how Taunton may have committed the crimes or was involved in their commission.  *See id.* at 823–24.

The affidavit seeking a warrant to search Sims' cell phone recites that cell phones are commonly used in the commission of crimes, that the cell phone in question is controlled by Sims, and that the affiant believes that Sims' cell phone contains evidence of criminal activity, such as subscriber information, text messages, voice calls, and cell-tower and GPS site coordinates.  The affidavit describes Annie's death by gunshot at her residence, Annie's missing vehicle, the suspicion of the neighbor and relative that Sims may be responsible for Annie's death, specific facts from the relative leading to her suspecting Sims' involvement, a specific search of the residence uncovering the absence of Annie's vehicle, purse, and purse contents, including credit cards and guns, the use of at least one stolen credit card by Sims and Morrison in Oklahoma within hours after the murder, the tracking of Sims' cell phone location leading to authorities' location of Annie's vehicle and, ultimately, to Sims and Morrison, themselves.  The affidavit also notes Sims'

10

arrest in connection with the course of events. The affidavit concludes that there is "reason to believe that information gained from" Sims' cell phone "will be useful in the investigation."

These recitations within the four corners of the above affidavit include information missing from the *Taunton* affidavits: evidence suggesting a link between Sims and Annie's murder, setting out the relationship between Sims and Annie, and information suggesting that Sims may have shot Annie. The cell phone affidavit supports the trial court's finding of probable cause for the issuance of a search warrant for the contents of Sims' cell phone.

The affidavit seeking a warrant to search Sims' Facebook data, likewise, recites various facts, though its recitations were thinner than the facts set out in the cell phone affidavit. It asserts that Sims had a particular Facebook account and that the affiant believes that Sims' account "contains private messages, private messages with photographs, photographs, wall updates, and wall posts and other information" related to Annie's murder. It recites basic facts of Annie's murder, including the fatal gunshot wound, the missing vehicle, Sims being a suspect along with Morrison, basic facts on why Sims was a suspect in the murder, the missing purse, credit cards, and guns, Sims' and Morrison's use of the stolen credit card in Oklahoma, the use of Sims' cell phone tracking data to find and arrest Sims and Morrison. It, too, notes Sims' arrest in connection with these events.

As stated by our sister court, "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, giving all of the circumstances set forth in the affidavit . . . there is a fair probability that . . . evidence of a crime will be found in a particular place." *Wise v. State*, 223 S.W.3d 548, 556 (Tex. App.—Amarillo 2007, pet. ref'd). It is reasonable to conclude,

11

from the four corners of the affidavit that there is a fair probability that evidence of the crime would be found on Sims' Facebook account. This supports the trial court's finding of probable cause for the issuance of the search warrant for Sims' Facebook data. We overrule this point of error.

We affirm the judgment of the trial court.


Josh R. Morriss, III
Chief Justice

Date Submitted:     June 30, 2017
Date Decided:       July 20, 2017

Publish