# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-60760

United States Court of Appeals
Fifth Circuit

**FILED**

December 4, 2017

Lyle W. Cayce
Clerk

FREDERICK L. ROBINSON,

> Plaintiff - Appellant

v.

JACKSON STATE UNIVERSITY; VIVIAN FULLER, Doctor (Individually);
JOHN 1-10 DOES,

> Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:13-CV-7

Before REAVLEY, ELROD, and SOUTHWICK, Circuit Judges.

PER CURIAM:*

Fred Robinson brought a Title VII and First Amendment retaliation lawsuit against Jackson State University and its Athletic Director, Dr. Vivian Fuller, alleging Dr. Fuller fired him because he provided unfavorable testimony to the Equal Employment Opportunity Commission. A jury found retaliation and awarded damages to Robinson. The district court, however,

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-60760

granted judgment as a matter of law in favor of Jackson State, concluding Robinson submitted insufficient evidence that Dr. Fuller knew about Robinson's testimony at the time of the termination.

Because we conclude Robinson submitted legally sufficient evidence of both decisionmaker knowledge and ultimate causation, we REVERSE both the district court's judgment as a matter of law and order denying Robinson attorney's fees, and we REMAND the case to the district court for proceedings consistent with this opinion.

## I.    BACKGROUND

In August 2011, Jackson State University appointed a new athletic director, Dr. Vivian Fuller. Shortly thereafter, Lolita Ward, a secretary in the athletics department, claimed Dr. Fuller gave her looks and gestures of a sexual nature. Two coworkers alleged to have witnessed Dr. Fuller's conduct. First, Fred Robinson, a certified trainer and the then-longtime Director of Sports Medicine, saw Dr. Fuller "undressing" Ward with her eyes. Second, Dalandus Henderson, a budget accountant for the athletics department, observed Dr. Fuller approach Ward's office and lick her tongue out at Ward.

Dr. Fuller fired Ward in October 2011, and Ward then filed a retaliation charge with the Equal Employment Opportunity Commission (EEOC). After Ward's termination, Robinson and Henderson attended an athletics-department meeting organized by Dr. Carolyn Meyers, President of Jackson State. According to Henderson, President Meyers accused the department of mistreating Dr. Fuller and told the entire department "that she would take legal matters and they would let anybody go who opposed Dr. Fuller."

The EEOC investigated Ward's allegations and organized interviews with six Jackson State employees, including Robinson, Henderson, and Dr. Fuller. Prior to the interview, Robinson met with two Jackson State attorneys:

No. 16-60760

David Buford, the school's then-general counsel, and Latoya Merritt, the school's retained outside counsel. Robinson told the attorneys about Dr. Fuller's conduct. Both attorneys were also present when Robinson relayed his observations to the EEOC investigator on April 30, 2012. Henderson, too, told the EEOC about his observations. Robinson and Henderson were the only interviewees to corroborate Ward's allegations. Meanwhile, Dr. Fuller met with the same attorneys to discuss her own EEOC testimony. And Dr. Fuller continued to meet with those attorneys regarding Ward's EEOC complaint.

Approximately one month later, Dr. Fuller fired both Robinson and Henderson. Neither termination letter supplied a justification. In later responses to the EEOC, however, Jackson State gave the same two reasons for both terminations: (1) reorganization of the athletic department and (2) Dr. Fuller had difficulty finding Robinson and Henderson throughout the workday.

Robinson then filed suit against Jackson State and Dr. Fuller (collectively, "Jackson State"), alleging retaliation under Title VII and the First Amendment. The district court denied Jackson State's motion for summary judgment. At the subsequent trial, two primary questions arose: (1) whether Dr. Fuller had actual knowledge of Robinson's EEOC interview and (2) whether Dr. Fuller's proffered justifications were pretextual.

On the decisionmaker-knowledge issue, Dr. Fuller denied any prior awareness of Robinson's testimony. Buford, too, denied telling Dr. Fuller about Robinson's interview. Merritt, operating as trial counsel for Jackson State, provided no testimony at all. As a result, Robinson was without direct evidence of decisionmaker knowledge. Robinson relied instead on a circumstantial case composed of testimony pertaining to (1) the temporal proximity of Robinson's firing to his interview; (2) the knowledge of Jackson State's attorneys; (3) Dr. Fuller's marked change in behavior toward Robinson after the EEOC interview (avoiding him "at all costs"); (4) the existence of pretext; (5) President Meyers's

3

threat of termination to Dr. Fuller's opponents; and (6) the parallel experiences of Henderson.

As for the justification itself, Dr. Fuller and Buford testified that Dr. Fuller had already made the decision to fire Robinson prior to March 2012 and thus before the April interview. Furthermore, Dr. Fuller added four new justifications at trial (in addition to reorganization and Robinson's absenteeism): (1) Robinson left an ill student at a hospital with the director of football operations; (2) Robinson did not attend certain events he was supposed to attend; (3) Robinson put an African proverb on his trainer uniform; and (4) Robinson once called Dr. Fuller an "African Nubian queen." These justifications each relate to events occurring in fall 2011. Jackson State relied also on Robinson's deposition testimony, in which he identified other potential reasons for his termination: organizational changes and a February 2012 complaint letter he sent to Human Resources. Robinson countered with much of the same evidence he used to show decisionmaker knowledge. In addition, Robinson submitted evidence that the athletics department was already below the recommended number of certified trainers, Dr. Fuller's explanation shifted over time, Dr. Fuller failed to comply with relevant termination procedure, and Robinson's name appeared as an employee on the very reorganization plan used to justify his termination.

Jackson State twice moved for judgment as a matter of law during trial, and the district court denied both motions. The jury returned a verdict for Robinson, finding decisionmaker knowledge and concluding that Robinson would not have been fired but for his EEOC interview. As for damages, the jury awarded Robinson $7,100 in lost income, $25,000 in emotional pain and suffering, and $75,000 in punitive damages.

Post-verdict, Jackson State renewed its motion for judgment as a matter of law, this time coupling it with an alternative motion for new trial and

4

No. 16-60760

remittitur. When the district court failed to rule for over a year, Robinson moved to transfer the case. One month later, however, the court granted Jackson State's motion for judgment as a matter of law, concluding only that Robinson lacked sufficient evidence of decisionmaker knowledge (evidence beyond mere speculation). In turn, the court denied Robinson's motion for attorney's fees. Robinson timely appealed.

## II.    DISCUSSION

### A. Issues Before the Court

Before reaching the substance of the decision below, Jackson State seeks to narrow the claims. Specifically, Jackson State argues Robinson abandoned his First Amendment retaliation claim on appeal because he "does not even mention the First Amendment in his appellate brief" and "failed to raise and brief the issue of whether the district court erred in reversing the jury's $75,000 punitive damage award against Dr. Fuller."

This circuit has articulated the standard for abandonment in a couple ways. In one instance: "An appellant abandons all issues not raised and argued in its *initial* brief on appeal." *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994). In another: "If a party fails to mention a district court's disposition of certain claims in its briefing, such claims are considered abandoned." *Stem v. Gomez*, 813 F.3d 205, 213 (5th Cir. 2016) (internal quotations omitted).

Whatever the standard, Robinson met it in his initial brief. Though Robinson did not mention the "First Amendment" in that phraseology, his initial brief specified, "[t]his is a 42 U.S.C.A. § 1983 and 42 U.S.C.A. § 2000e-3(a) suit," a suit that resulted in a "verdict in favor of Robinson and awarded him $32,100.00 in actual damages and $75,000.00 in punitive damages." Jackson State acknowledges correctly that Robinson's § 1983 claim (*i.e.*, the First Amendment claim) provided the sole basis for his punitive damages award. As a result, Robinson's explanation of both the claims and the

5

singular complained-of judgment—the district judge's decision to overturn the verdict—was, in fact, an explanation of the "district court's disposition of" the relevant First Amendment claim. *Stem*, 813 F.3d at 213. Furthermore, Robinson asks not for a "partial reinstatement," a "reinstatement of actual damages," or a "reinstatement of Title VII relief"; he asks this Court to "reinstate the jury verdict." He lobbies for that relief by addressing and arguing the relevant legal "issue" (indeed, the only issue) upon which the district court passed judgment—a supposed lack of decisionmaker knowledge. *Cinel*, 15 F.3d at 1345. On those grounds, we find no abandonment.

## B. The District Court's Judgment as a Matter of Law

### 1. *Standard of Review*

"We review a district court's grant of judgment as a matter of law *de novo*, applying the same standard as the district court." *Laxton v. Gap Inc.*, 333 F.3d 572, 577 (5th Cir. 2003). Judgment as a matter of law is appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1). This occurs only when "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *Laxton*, 333 F.3d at 577 (internal quotations omitted).

When "review[ing] all of the evidence in the record," we "must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). As a consequence, we "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. But we do credit "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* (internal quotations omitted).

No. 16-60760

## 2. *Retaliation Standards*

Robinson's case involves two types of retaliation claims, Title VII and the First Amendment, each with its own elements. That said, this appeal turns ultimately on a shared component of the claims—that there must be a causal connection between Robinson's EEOC interview and his termination.

A Title VII retaliation plaintiff who relies on circumstantial evidence to prove discrimination (as Robinson does) must initially abide by the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). That framework requires the plaintiff to make out a three-element prima facie case of unlawful retaliation: (1) the plaintiff "engaged in protected activity"; (2) the plaintiff "suffered from an adverse employment action"; and (3) "there was a causal connection between the activity and the adverse employment decision." *Adams v. Groesbeck Indep. Sch. Dist.*, 475 F.3d 688, 691 (5th Cir. 2007). Once the plaintiff meets this prima facie burden, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002). And finally, once the employer supplies such a justification, the "burden then shifts back to the plaintiff to show by a preponderance of the evidence that the employer's nondiscriminatory explanation is pretextual." *Id.*

Following a jury trial, however, the *McDonnell Douglas* burden-shifting framework "becomes moot," and we evaluate only whether "legally sufficient evidence supported the jury's finding." *Adams*, 475 F.3d at 691. That "ultimate determination is whether, 'but for' the protected conduct, the employer would not have engaged in the adverse employment action." *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372 (5th Cir. 1998).

A First Amendment retaliation plaintiff is subject to the (slightly different) *Mt. Healthy* burden-shifting framework. *See Mt. Healthy City Sch.*

7

*Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The plaintiff must make an initial four-part showing: "(1) the plaintiff suffered an adverse employment decision, (2) the plaintiff's speech involved a matter of public concern, (3) the plaintiff's interest in speaking outweighed the governmental defendant's interest in promoting efficiency, and (4) the protected speech motivated the defendant's conduct." *Kinney v. Weaver*, 367 F.3d 337, 356 (5th Cir. 2004). Once the plaintiff meets this burden, an employer "may still avoid liability by showing, by a preponderance of the evidence, that it would have taken the same adverse employment action even in the absence of the protected speech"—*i.e.*, a lack of but-for causation. *Haverda v. Hays Cty.*, 723 F.3d 586, 591–92 (5th Cir. 2013). The plaintiff can, however, "refute that showing by evidence that his employer's ostensible explanation for the discharge is merely pretextual." *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991).

Jackson State concedes all but the causal components of Robinson's retaliation claims. Thus, despite the nuances in the burden-shifting schemes at play, we arrive, under either retaliation theory, at the same intersection: whether there was legally sufficient evidence that Robinson's EEOC interview (his protected activity) caused his termination (the adverse employment action). *Douglas*, 144 F.3d at 372; *Haverda*, 723 F.3d at 591. That causation issue manifests itself in two ways on appeal. First, we confront the district court's stated rationale for judgment as a matter of law: Robinson's protected activity could not have caused the termination if Dr. Fuller had no knowledge of the activity. And second, Jackson State argues (as an alternative basis for affirmance) that Robinson failed to counter Dr. Fuller's nondiscriminatory justification with competent evidence of pretext, meaning there was no ultimate proof of causation.

### 3. *Decisionmaker Knowledge*

The causation prong of any retaliation claim requires proof that the "employer knew about the employee's protected activity." *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir. 2003). The rationale is a simple one: "If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct." *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999).

Yet, direct proof of decisionmaker knowledge can be elusive, particularly when the decisionmaker (like Dr. Fuller here) disclaims prior knowledge entirely. It is unsurprising then that "[a] decisionmaker's awareness may be established by circumstantial evidence." *E.E.O.C. v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017). But carrying that burden requires "more evidence than mere curious timing coupled with speculative theories," and isolated "evidence of generalized discussions between a decisionmaker and someone with knowledge of the plaintiff's protected activity creates only a speculative inference regarding the decisionmaker's awareness." *Id.* (internal quotations omitted). Consequently, the question we must answer is whether Robinson's quantum of circumstantial evidence created a reasonable inference of decisionmaker knowledge.

But first, a brief clarification of our standard is in order. Robinson suggests we need only find "general corporate knowledge," a standard adopted by the Second Circuit. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013). Not so in this circuit, for we have consistently required proof of "actual" decisionmaker knowledge. *E.g.*, *Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595, 604 (5th Cir. 2001). Whatever the law may be elsewhere, mere "constructive notice" does not suffice in this circuit. *Corley v. Jackson Police Dep't*, 639 F.2d 1296, 1300 n.6 (5th Cir. 1981).

No. 16-60760

We now conclude legally sufficient evidence supported the jury's finding of decisionmaker knowledge. We observe first that Robinson's record is unlike our past cases involving plaintiffs who failed "to produce any evidence that a decisionmaker was aware of the protected activity." *EmCare*, 857 F.3d at 683 (citing *Bain v. Ga. Gulf Corp.*, 462 F. App'x 431, 433–34 (5th Cir. 2012) (per curiam) (affirming judgment as a matter of law when plaintiff did not present "any evidence that [the decisionmaker] knew of the protected deposition testimony" at the time of the adverse employment decision)).

Jackson State must instead liken Robinson's proof to those cases involving a merely speculative inference of decisionmaker knowledge. *See, e.g.*, *Chaney*, 179 F.3d at 168–69 (rejecting inference of decisionmaker knowledge from a supervisor's single curious comment when the employee never told anyone at his place of employment about his protected activity and two years elapsed before his termination); *Turner v. Jacobs Eng'g Grp., Inc.*, 470 F. App'x 250, 253 (5th Cir. 2012) (per curiam) (rejecting inference of decisionmaker knowledge from the decisionmaker's single negative comment and general conversations between the decisionmaker and other knowledgeable employees).

But Jackson State's comparison falls short; Robinson's evidence gave the jury a more-than-adequate basis to infer decisionmaker knowledge. Drawing all reasonable inferences in favor of Robinson, the record established the following. Before Robinson attended the EEOC interview, Dr. Fuller's direct superior, President Meyers, had already threatened the athletics department "that she would take legal matters and they would let anybody go who opposed Dr. Fuller." Robinson and Henderson were the only interviewees to exhibit such "opposition" through testimony unfavorable to Dr. Fuller. Moreover, two Jackson State attorneys witnessed the Robinson and Henderson interviews firsthand and thus learned of the testimony given therein. Dr. Fuller met with

10

both attorneys prior to her own interview, and she continued to meet with those attorneys to discuss the Ward legal matter—the very topic at the heart of Robinson and Henderson's testimony. It was by no means unreasonable for the jury to infer from these attorney-and-accused conversations that Dr. Fuller learned the identities of the sole corroborators.[1] This is particularly true in light of what followed; Dr. Fuller began to treat Robinson differently following the interview, avoiding him at all costs.[2] And ultimately, just as President Meyers foreshadowed, Dr. Fuller fired both Robinson and Henderson the following month, supplying the same boilerplate, arguably pretextual[3] justification.

All the categories of evidence outlined above—temporal proximity, specific conversations with knowledgeable colleagues, changed decisionmaker behavior following complaints, pretext, and parallel outcomes for similarly-situated employees—are among the prototypical circumstantial indicators of decisionmaker knowledge (and of causation in a broader sense). *See EmCare*, 857 F.3d at 684 & n.2. In that vein, we have twice before upheld knowledge findings premised on records similar to Robinson's. *See, e.g.*, *id.* (affirming decisionmaker-knowledge finding when (1) a supervisor criticized the employee following each complaint; (2) the supervisor worked in the same division as the decisionmaker; (3) the supervisor and decisionmaker discussed the employee's performance; and (4) the decisionmaker fired the three

---

[1] The parties litigated below whether the attorneys' knowledge should be imputed, as a matter of law, to Dr. Fuller. We need not reach the imputation question, however, because we conclude the collective circumstantial record created a sufficient inference of decisionmaker knowledge.

[2] We note here that we rely on Robinson's testimony about a change in Dr. Fuller's behavior and not on Robinson's separately expressed *belief* in Dr. Fuller's awareness. The former may indicate decisionmaker knowledge. *See EmCare*, 857 F.3d at 684. The latter is pure speculation.

[3] We discuss pretext below. *See infra* § II.B.4.

complaining employees on the same day); *Ellerbrook v. City of Lubbock*, 465 F. App'x 324, 332–33 (5th Cir. 2012) (per curiam) (affirming decisionmaker-knowledge finding when a supervisor with knowledge of the protected activity discussed with the decisionmaker how to interview the plaintiff).

We need not speculate whether any single category of Robinson's evidence would have sufficed—that is not our standard. *See Miller v. Raytheon Co.*, 716 F.3d 138, 145 (5th Cir. 2013) (acknowledging that evidence, "[c]onsidered in isolation," might be inadequate and instead looking at the "accumulation of circumstantial evidence" to evaluate a retaliation claim). We need only conclude (and we do conclude) that evidence in the quantity and character present in Robinson's record is legally sufficient. At bottom, the jury could have accepted as mere coincidence that Dr. Fuller unknowingly (indeed, fortuitously) happened to eliminate the sole dissenting employees shortly after they spoke up. But, given the totality of the record, the jury was not obligated to do so, and for that reason, we leave their decisionmaker-knowledge finding intact. *See id.* (affirming a verdict when "reasonable men could differ").

## 4. *Ultimate Causation*

Before we may reinstate the verdict, however, we must consider an alternative basis for affirmance—a lack of ultimate causation. *See Mo. Pac. R.R. Co. v. Harbison-Fischer Mfg. Co.*, 26 F.3d 531, 538 (5th Cir. 1994) ("[W]e can affirm the district court on . . . alternate grounds."). Ultimately, we decline Jackson State's invitation to affirm on that basis.

Because a trial on the merits occurred below, "the evaluation process is streamlined and we proceed directly to the ultimate question of whether the plaintiff presented enough evidence for a jury to find that discrimination occurred." *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004) (internal quotations omitted). But what does proof of the ultimate question entail? When an employer "proffer[s] a nondiscriminatory purpose for the

adverse employment action," the employee may seek to carry its ultimate burden by "offer[ing] *some* evidence . . . that permits the jury to infer that the proffered explanation was a pretext for discrimination." *Id.* (internal quotations omitted). Said differently by the Supreme Court, "the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Reeves*, 530 U.S. at 143 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Jackson State and Dr. Fuller proffered such a justification (several, actually), and Robinson sought to meet his ultimate burden via proof of pretext.

Evidence of pretext "may take a variety of forms." *Patterson v. McLean Credit Union*, 491 U.S. 164, 187 (1989). First, an employer's rationale is "suspect where it ha[s] not remained the same between the time of the EEOC's investigation and the ultimate litigation." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 237 (5th Cir. 2015) (internal quotations omitted). Second, "an employer's departure from typical policies and procedures" can bolster an inference of pretext. *Feist v. La., Dep't of Justice, Office of the Attorney Gen.*, 730 F.3d 450, 455 (5th Cir. 2013). And third, the "[c]lose timing between an employee's protected activity and an adverse action" may "satisfy the causal connection element," though it is not always independently sufficient. *Id.* at 454 (alteration in original and internal quotations omitted). However, a plaintiff's mere belief that his employer acted on an illegitimate reason is inadequate absent other evidence of pretext. *Sherrod v. Sears, Roebuck & Co.*, 785 F.2d 1312, 1316 (5th Cir. 1986).

Robinson must first overcome a key causal hurdle: the timing of Dr. Fuller's decision-making process. That is, if the jury were obligated to accept Buford's testimony that Dr. Fuller already made the reorganization-based decision to fire Robinson before March 2012 (and before the April 2012

interview), then proof of causation would be an uphill battle. After all, protected activity is unlikely to cause a termination if an employer already decided to terminate the employee. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam) ("Employers need not suspend previously planned transfers upon discovering [protected activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

Alas, Dr. Fuller's reorganization plan itself created the doubt sufficient for the jury to discount Jackson State's alleged timeline. The plan—authored by Dr. Fuller and published after she had purportedly made her decision to fire Robinson—listed Robinson as the Director of Sports Medicine, a person "responsible for success of this action plan and its main activities." At trial, Dr. Fuller and a former Jackson State administrator both attempted to explain away Robinson's inclusion by describing the plan as a mere "snapshot" of those officers currently employed, not a guarantee of future employment.

Two problems. First, nowhere in the plan does Jackson State's "snapshot" qualification appear. And second, the very language of the plan belies Jackson State's explanation; the plan refers to itself as a forward-looking instrument, one that "shall be implemented" by those "responsible" officers. Thus, the jury was entitled to reject Jackson State's extra-textual explanation and infer instead that Dr. Fuller *anticipated* Robinson's continued employment as of March 2012, the time of the plan's publication. The import of such an inference is obvious: an employer does not anticipate the continued employment of someone she already decided to fire. And with Jackson State's timeline called into question, the jury was free to infer Dr. Fuller fired Robinson based on a post-March 2012 occurrence—the April EEOC interview being a logical culprit. *See Reeves*, 530 U.S. at 147 ("[O]nce the employer's

justification has been eliminated, discrimination may well be the most likely alternative explanation . . . .").

Timeline aside, we note further that Robinson's evidence tracks each of the three traditional indicators of pretext: changing explanations, departure from termination protocol, and temporal proximity. Jackson State justified Robinson's termination first on the basis of the reorganization plan and his absenteeism. But, at trial, Dr. Fuller's explanation grew substantially, including four previously undisclosed justifications. In addition, Dr. Fuller neither submitted a letter to Human Resources nor received approval from Robinson's department head prior to termination—both prerequisites under Jackson State's policies. And finally, Dr. Fuller fired Robinson just one month after Robinson's testimony. These traditional indicators of pretext gave the jury further reason to doubt the veracity of Dr. Fuller's proffered justifications.

Next, we reject Jackson State's suggestion that Robinson's own speculation about the reasons for his firing somehow precluded the jury from finding actual discrimination. We find no authority for that proposition, and instead, it conflicts with the essence of our retaliation inquiry: we look to the "real reason" for the termination, not an employee's "subjective belief" about its impetus. *Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999) (internal quotations omitted).

Lastly, Jackson State offers no rebuttal to two additional causal indicators: (1) the explicit threat of retaliatory termination by President Meyers and (2) the parallel treatment of Henderson, the only other employee to corroborate allegations against Dr. Fuller. Needless to say, both support further an inference of discrimination. *See Powell v. Rockwell Int'l Corp.*, 788 F.2d 279, 283 (5th Cir. 1986) (finding sufficient evidence of pretext when, among other things, "officials made specific threats against [the employee] for" engaging in protected activity); *EmCare*, 857 F.3d at 684 n.2 (emphasizing "the

fact that the three employees who complained together were all fired the same day" as support for causation).

In sum, Robinson offered "sufficient evidence to find that the employer's asserted justification is false," and as a consequence, the jury was entitled "to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148. This is simply not a case in which "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* In turn, judgment as a matter of law was inappropriate.

## III.   CONCLUSION

Because sufficient evidence supports a finding of both decisionmaker knowledge and ultimate causation, the district court erred in overturning the jury's verdict. We therefore REVERSE the district court's judgment as a matter of law and its order summarily denying Robinson attorney's fees, and we REMAND for the district court to (1) reinstate the jury's verdict and (2) consider both an amended motion for Robinson's attorney's fees and Jackson State's unresolved motion for new trial and remittitur. Appellant's motion for reassignment is granted, and on remand, Judge Wingate is directed to deliver this case to the Chief Judge of the Southern District of Mississippi for reassignment. *Pennypacker v. City of Pearl*, 689 F. App'x 332, 333 (5th Cir. 2017) (per curiam); *see also In re State of Miss.*, No. 16-60610 (5th Cir. Sept. 29, 2016).