

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

## No. 02-23-00053-CR

———————————————————

JAMES IRVEN STALEY III, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 3
Tarrant County, Texas
Trial Court No. 1744358D

Before Kerr, Womack, and Walker, JJ.
Opinion by Justice Kerr
Concurring Opinion by Justice Walker

# OPINION

In two issues, James Staley III appeals his conviction and life sentence for the capital murder of his then-girlfriend's two-year-old son. He argues (1) that the seizure and search of his cellphone, laptop, and an Apple Mac Mini violated the Fourth Amendment to the United States Constitution, including a subissue that the underlying warrant was an impermissible general warrant, and (2) that the search-warrant affidavit that led to those devices' being seized and searched failed to comply with Articles 18.0215 and 18.04 of the Texas Code of Criminal Procedure. *See* U.S. Const. amend. IV; Tex. Code Crim. Proc. Ann. arts. 18.0215, 18.04.

We agree that the warrant affidavit lacked probable cause for the seizure and search of his electronic devices and that the trial court should have granted his motion to suppress the evidence discovered on those devices. But we also conclude that, at trial, Staley forfeited his complaint about one category of that evidence: text messages extracted from his cellphone.

Without needing to reach Staley's general-warrant or statute-based issues (both of which the State argued were forfeited), we reverse the conviction and remand for a new trial.

# I.

## Background[1]

When Amber Odom began dating Staley in the summer of 2018, she had a toddler son, Jason Wilder McDaniel.[2] Within three weeks, Odom and Wilder—as he was known—had moved into Staley's home, but the relationship did not go smoothly; Odom left and came back more than once in the span of their two-and-a-half-month relationship, returning for the final time just three days before Wilder died during the night of October 10, 2018.

One incident—whose significance will become apparent—involved a series of texts and a Snapchat video that Staley sent Odom late on the night of September 1, 2018, while she was at work and he was home babysitting Wilder. Staley texted Odom that Wilder had fallen off the bed and had "a knot on his noggin" and "busted his head and thigh good." The accompanying selfie Snapchat video showed Staley sitting on the couch cradling Wilder, on whose forehead Staley focused the camera as he

---

[1]We largely limit the facts to those involving whether probable cause supported relevant aspects of the search warrant, an analysis constrained to the warrant affidavit's four corners. *See State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). Although we include contextual facts from the proceedings below that are not in the affidavit, we do not consider them in analyzing Staley's suppression issue. *See Navarete-Torres v. State*, No. 01-21-00322-CR, 2024 WL 1265389, at *1 n.2 (Tex. App.—Houston [1st Dist.] Mar. 26, 2024, no pet.) (mem. op., not designated for publication).

[2]Before the 2023 trial, Odom married Wilder's father and testified as Amber McDaniel.

explained that Wilder had sustained "quite the shiner" by falling off the bed. Upon Odom's return to Staley's house in the early morning hours of September 2, she used her cellphone camera to photograph Wilder's face, which showed significant bruising.[3]

On the morning of October 11, 2018, Odom discovered Wilder's lifeless body lying on the floor beside his crib.[4] Law enforcement arrived, and Staley consented to a search of his home.

Ten days later, on October 22, a Wichita Falls police officer swore out an "Affidavit for Evidentiary Search Warrant" based on which a magistrate signed the requested warrant. Electronic devices seized from Staley's home under the warrant included cellphones, a laptop, and an Apple Mac Mini, which is a small computer that operates like a regular MacBook.

The Wichita Falls Police Department sent the devices to the FBI's regional computer-forensics laboratory in Dallas for examination. An FBI examiner found a GoPro video on the Mac Mini that recorded Staley's suddenly and forcefully striking

---

[3]At the time, Odom believed Staley's story that Wilder had fallen off the bed. Odom explained at trial that she had taken the photograph for her manager to prove that Odom had not been lying about why she left work early. Regardless, the warrant affidavit sheds no light on whether Odom expressed any suspicion of past abuse to the investigating officers on scene after Wilder's death.

[4]The resulting autopsy report labeled Wilder's cause of death as "undetermined."

Wilder on the forehead as Wilder slept upright on the couch.[5] At trial, another forensic witness testified that the GoPro video had been recorded the same night as the "quite the shiner" Snapchat video in which Staley said that Wilder had fallen off the bed.

The State also put into evidence State's Exhibit 149, consisting of thousands of messages retrieved from Staley's cellphone, and State's Exhibit 156, consisting of edited versions of the "quite the shiner" and other videos discovered on Staley's cellphone. The State also elicited expert testimony that Staley had downloaded and run "CCleaner"[6] on his laptop several times shortly after Wilder's death.

Before trial, Staley moved to suppress "certain items of the Defendant's electronic devices . . . , including but not limited to" the Apple Mac Mini. In January 2023, the trial court held a hearing on Staley's motion and denied it.

A jury convicted Staley of capital murder, and the trial court sentenced him to life in prison.

---

[5]The State forewarned the jury about the GoPro video in its opening statement: "I need to stop right now and I need to tell you I'm sorry. I'm sorry that this video exists. I'm sorry that I have to tell you about it. And I'm sorry that you're gonna have to see it because y'all -- you're never gonna unsee it."

[6]According to one of the State's computer-forensics experts, CCleaner is "an anti-forensic program" whose "purpose is to delete tracks, delete things you -- artifacts created by a user." The expert had seen CCleaner used "as an anti-forensic for people who are trying to destroy digital evidence."

## II.

## The Warrant Affidavit

Paragraphs 1 and 2 of the October 22, 2018, affidavit identified Staley and described his residence as the location to be searched and as "where the items to be seized might reasonably be kept or hidden."

Paragraph 3 recited the affiant's belief that—among other things—unspecified[7] computer equipment and electronic communications stored within computers would be found at Staley's home. Paragraph 4 laid out the facts of the "CURRENT INVESTIGATION," from which we quote the pertinent passages and highlight all references within those passages that might conceivably point to probable cause to seize and search Staley's electronic devices, including those portions to which the State has directed us:

> On 10/11/2018, Emergency Personnel including First Responders, AMR, and Police were dispatched to 2012 Irving Place, located in Wichita Falls, Wichita County, Texas.
>
> Information from 911 Dis[ ]patch indicated that a woman was screaming something about her baby. A child was found unresponsive. AMR personnel arrived first and determined the two year old male child to be deceased.
>
> Patrol Officer Casy Kirkpatrick arrived on scene and was advised that the child[']s mother had found her child on the floor outside of the crib he had been sleeping in. . . .

---

[7]As the affidavit recites, law enforcement had consensually searched Staley's home eleven days earlier, on October 11, 2018, but the affidavit does not describe any particular electronic device that was spotted (and actually photographed) at that time.

The child death investigation involves a two year old male child identified as Jason "Wilder" McDaniel. His mother was present on scene and identified herself as Amber Odom (age 28). It was discovered that **Amber and her son were staying at the residence as guests of James Irven Staley III (age 35) for approximately the last two months. Amber and James indicated they were in a dating relationship at this time**.

Officer Kirkpatrick noted that **Amber was "extremely upset"** and he was unable to get much information from her. Officer Kirkpatrick noted that James Staley showed him to the bedroom, . . . where Wilder had been found by his mother . . . Officer Kirkpatrick also noted that James **Staley stayed in the hallway or inside his closet most of the time and would not go anywhere near Amber or Wilder**.

. . . .

Det[.] Nelson requested and received a signed Consent to Search from James Staley.

Overall photographs were taken at the time and the bedding from within the crib was collected.

. . . .

Due to visual observations of the child while on scene, the presence of blood on the pillow inside the crib, the blood on the floor in front of the crib, and information that the child was found unresponsive on the floor outside of the crib, the child[']s death is believed to be suspicious and foul play is suspected.

During this child death investigation, **Detective Nelson learned from Amber that on a previous date on or about 08/31/2018 while she was at work and while James Staley was caring for Wilder, she discovered bruising on Wilder's face the morning of 09/01/2018.**[8] **Amber was told by James that Wilder fell off a bed and hit his head. Amber took a photo at the time, and she forwarded it to Detective Nelson.** Detective Nelson observed bruising on Wilder[']s

_____

[8]Although the dates are slightly off, this passage refers to the "quite the shiner" incident.

face. Amber indicated **she had been staying at James' residence at the time, but later moved out on or about 10/06/2018 then began staying there again on 10/07/2018**.

. . . .

*Digital Evidence*

Affiant knows from training an[d] experience that as is the case with most digital technology, **communications by way of computer device(s) can be saved or stored on the device itself, to a remote cloud storage location, or to multiple devices by way of a process known as syncing.** Storing this information can be intentional, i.e., by saving an e-mail or photograph as a file on the device or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or Internet Service Provider client software, among others). In addition to electronic communications, a device user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner can often recover evidence which shows that a device contains some of the files which were saved, uploaded or downloaded. Such information or data in the device may be maintained indefinitely until overwritten by other data.

Affiant knows from training and experience that **searches and seizures of digital evidence from computers require agents to seize most or all computer items (hardware, software, passwords and instructions) to be processed later** by a qualified computer expert in a laboratory or other controlled environment. Users may store information or images in random order with deceptive file names, which requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process renders it impractical to attempt this kind of data search on site.

Affiant knows from training and experience that **searching computer systems for criminal evidence requires experience in the computer device field and a properly controlled environment** in order to protect the integrity of the evidence and recover even "hidden", erased, compressed, password-protected, or encrypted files which Affiant knows are commonly found in computer devices. Since computer evidence is

extremely vulnerable to tampering or destruction (from external sources "remote wiping", and from destructive code imbedded in the system as a "booby trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

Affiant knows from training and experience that **computers used to access the Internet usually contain files, logs or file remnants which would tend to show ownership and use of the computer as well as ownership and use of internet service accounts** used for the internet or cellular data network access.

Affiant knows from training and experience that **search warrants of residences involved in computer or digitally related criminal activity usually produces items that would tend to establish ownership or use of computers** and ownership or use of any Internet service accounts accessed to include credit card bills, telephone bills, correspondence and other identification documents.

Affiant knows from training and experience that search warrants of residences usually reveals items that would tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

**Based upon the foregoing, there is probable cause to believe that** the items, files and documents identified above and **the material listed in paragraph #3 of this affidavit, as well as other related items, files and documents pertaining to this investigation** of Injury to a Child – that caused or led to the death or serious bodily injury of a child less than 5 years of age, in violation of Texas Penal Code Section 22.04, **are located on the premises** at 2012 Irving Place, Wichita Falls, Wichita County, Texas.

Some of the information noted in this affidavit for search warrant has been related to Affiant by the person(s) and/or source(s) attributed or referenced and is based on their training, experience and personal observations. Affiant further believes in good faith that the information provided herein to be true and correct. Because **the sole purpose of this affidavit is to establish probable cause that a criminal offense has occurred**, not every relevant fact known to me, or to other investigators, is included within. Rather, **I have set forth only those facts necessary to establish probable cause that evidence of**

**violations of Section 22.04 of the Texas Penal Code, are located at the above address.** [Emphases added.]

## III.

## Motion to Suppress; Hearing

At the start of the January 13, 2023 hearing on Staley's suppression motion, he had three different such motions on file, but by the end of the hearing Staley had withdrawn the earlier two,[9] leaving his January 12 motion as the one on which the trial court ruled. That motion sought to suppress "the searches and seizures of certain items of the Defendant's electronic devices that were illegally seized after issuance of a search warrant on October 22, 2018 . . . , including but not limited to" the Mac Mini and, in the prayer, asked that "all evidence obtained resulting from the execution of

---

[9]Staley's second suppression motion had sought a *Franks* hearing based on a June 2022 warrant: years after the initial warrant, a second Wichita Falls police officer presented a different magistrate with a new search-warrant affidavit specifically describing the Mac Mini as a device to be searched for evidence relating to Wilder's murder and elaborating considerably on the probable-cause bases for searching it. Staley challenged the June 2022 affidavit and resulting warrant as implicating *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978), which entitles a defendant to go behind a warrant affidavit's four corners if he can show that the affidavit contains knowingly untruthful, inaccurate, or incomplete information. During the suppression hearing, Staley noted that the State obtained this second warrant—which he characterized as a "cleanup effort"—a month after the court of criminal appeals issued its opinion in *State v. Baldwin*, 664 S.W.3d 122, 134 (Tex. Crim. App. 2022) (holding that "boilerplate language" in a warrant affidavit is not enough to establish probable cause to search a cellphone and that some sort of nexus between the device and the offense needs to be alleged). But because Staley withdrew his motion concerning the June 2022 warrant during the hearing, we need not further discuss it.

the search warrant be suppressed" and "further" seeking the suppression of evidence from the Mac Mini.

Comments and argument during the hearing from Staley, the State, and the trial court combine to show that everyone understood that the January 12 motion, although certainly focusing on the Mac Mini, challenged the seizure and search of all of Staley's electronic devices.[10] The trial court said as much in denying the suppression motion, finding that the affidavit "is sufficient and valid and supports the search and seizure of the electronic devices at the location in Wichita Falls, Texas."

After this ruling, defense counsel stated,

[J]ust to make sure my record is clear, by your denying that, you're essentially giving the State permission to allow that to come into evidence at the appropriate time subject to relevance and -- and other considerations. I just wanna make sure that by way of request, we could

_____

[10]A few examples include the State's arguing that reasonable inferences coupled with the affiant's training and experience "established a fair probability for the search for electronic devices like the Mac [M]ini and the cell phone would produce evidence of" a child homicide; that the magistrate would know that, in today's world, dating relationships "are through electronic communication, such as computers and cell phones"; and that the magistrate could infer that "in that 4,300 square-foot house there would be cell phones and/or computer devices," asking the trial court to "find that the seizure of electronic devices was within the scope" of the warrant.

For his part, Staley remarked that the affidavit did not have "one fact that pertains to electronic devices or a phone or a computer of any kind" and that there was "not a word of probable cause to even say that a computer's in that home, to say that a phone is in that home, . . . to even say that there's a tablet, a laptop, a camera or electronic device of any kind." Staley also noted the State's claim that the affidavit "authorized them to go seize all of these electronic devices, one of which is the one we've drawn to the Court's attention," when "not even a word . . . support[ed] an authorized search of electronic devices from that."

have a running objection to that. Case law says we stand up and say, no objection, we waive that. . . . I intend to be objecting anyway, but anything I fail to do perfectly, I'm asking the running objection cover that. Does that even make sense?

THE COURT: It makes sense. And I'll permit you a running objection to the ruling that I've made today with respect to the -- the search warrant and what was seized pursuant to the execution of the search warrant. . . . And I'm sure . . . those items will be offered at trial and I'll understand if you object then, but I'll -- you have a running objection -- . . . to whatever I've ruled on today.

## IV.

## Staley's Two Issues

Staley's first issue is broad: "The searches of [his] cellphone, laptop[,] and Mac Mini violated the Fourth Amendment to the Constitution of the United States." Within that issue are two discrete subissues:

- the search warrant lacked particularity and thus constituted a prohibited general warrant; and

- the affidavit did not support the magistrate's probable-cause finding.

Staley's second issue alleges purely statutory violations: that the search-warrant affidavit failed to comply with Texas Code of Criminal Procedure Articles 18.0215 and 18.04. *See* Tex. Code Crim. Proc. Ann. arts. 18.0215 (requiring that an application to search a "cellular telephone or other wireless communications device" must state the facts and circumstances giving the applicant probable cause to believe that criminal activity has been committed and that searching a cellphone is likely to produce evidence in investigating that criminal activity), 18.04 (requiring, among other

12

things, that a warrant must identify "as near as may be, that which is to be seized and name or describe, as near as may be, the person, place, or things to be searched").[11]

## V.

## No Probable Cause to Search Staley's Electronic Devices

Because it is dispositive, we address the second part of Staley's first issue, in which he contends that the search-warrant affidavit lacked probable cause for the magistrate to approve the seizure and search of his electronic devices, in particular his cellphone, laptop, and Mac Mini.

### A. Applicable principles; standard of review

The United States Constitution provides that no warrant may issue except upon probable cause as supported by oath or affirmation. *See* U.S. Const. amend. IV. Relatedly, our criminal-procedure code requires a "sworn affidavit setting forth substantial facts establishing probable cause" before a magistrate can issue a search warrant. *See* Tex. Code Crim. Proc. Ann. art. 18.01(b). "Probable cause exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular location." *Baldwin*, 664 S.W.3d at 130. As a reviewing court, we must "give great deference to a magistrate's probable[-]cause

---

[11]The State challenges the first part of Staley's first issue and his entire second issue as not having been raised in the trial court and thus not preserved for appeal. Based on our resolution of Staley's no-probable-cause attack on the search-warrant affidavit, which disposes of this appeal, we need not reach his additional issues because they would not provide him additional relief. *See* Tex. R. App. P. 47.1 (requiring appellate courts to address "every issue raised and necessary to final disposition of the appeal").

13

determination to encourage police officers to use the warrant process." *Id.* Notwithstanding that deference, a magistrate's action cannot merely ratify others' bare conclusions, and "courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued." *State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S. Ct. 2317, 2332–33 (1983)).

When a magistrate is determining probable cause to support a search warrant's issuance, the magistrate—and we—are constrained to the affidavit's four corners. *See Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013) (noting that a magistrate "may draw reasonable inferences solely from the facts and circumstances contained within the affidavit's four corners"); *see also McLain*, 337 S.W.3d at 271. In turn, we are not to invalidate a warrant "by interpreting the affidavit in a hypertechnical, rather than a common-sense, manner," *Bonds*, 403 S.W.3d at 873, but look only to see if the recited facts suffice to "support conclusions (1) that a specific offense was committed, (2) that the property or items to be searched for or seized constitute evidence of the offense or evidence that a particular person committed it, and (3) that the evidence sought is located at or within the thing to be searched," *Baldwin*, 664 S.W.3d at 130 (citing Tex. Code Crim. Proc. Ann. art. 18.01(c)). "The focus is not on what other facts could or should have been included in the affidavit; the focus is on the combined logical force of facts that are in the affidavit." *Duarte*, 389 S.W.3d at 354–55.

14

In keeping with these principles, the court of criminal appeals has cautioned against a magistrate's relying on mere "boilerplate" affidavit language—for example, incorrectly finding probable cause to seize and search an accused's cellphone based on an affiant's generic, barebones recitation that criminals are known to use cellphones. *Baldwin*, 664 S.W.3d at 134. Instead, boilerplate language "must be coupled with other facts and reasonable inferences that establish a nexus between the device and the offense." *Id.* at 123. This nexus does not require averring that a device was used "either during, or immediately before or after" the crime was committed; the affidavit may indicate, more broadly, that the device likely contains some evidence useful in investigating the crime. *Stocker v. State*, 693 S.W.3d 385, 388 (Tex. Crim. App. 2024).[12] Moreover, probable cause "cannot be based on mere conclusory statements of an affiant's belief." *Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex. Crim. App. 2007).

As for allowable inferences from a warrant affidavit, they are neither infinitely elastic nor amorphously unbounded. An affidavit that does not somehow connect a

---

[12] *Stocker* involved a cellphone search, and the court of criminal appeals quoted Article 18.0215(c)(5)(B) of the criminal-procedure code in correcting the appellate court's too-restrictive reading of *Baldwin*. 693 S.W.3d at 387–88 (noting that *Baldwin* court "did not say . . . that 'use' of a cell phone in aid of the actual perpetration of the crime that is on trial is, necessarily, the *only* 'specific fact' that can serve to establish the required 'nexus,' 'connection,' or 'tie' between a cell phone and an offense under investigation"). Although this case does not involve the cellphone-search statute specifically—Staley never brought it up in the trial court—*Stocker* broadly applies to the notion that an affidavit need not allege facts drawing a direct line between an electronic device and its use right around or during the crime's commission. Still, *some* nexus, connection, or tie must be shown.

15

suspected criminal offense to the thing (or place) to be searched "stacks inference upon inference" and lacks probable cause. *State v. Skarritt*, Nos. 01-22-00881-CR, 01-22-00884-CR, 01-22-00885-CR, 01-22-00886-CR, 2023 WL 4110853, at *12 (Tex. App.—Houston [1st Dist.] June 22, 2023, no pet.) (mem. op., not designated for publication); *Farhat v. State*, 337 S.W.3d 302, 309 (Tex. App.—Fort Worth 2011, pet. ref'd) (holding no probable cause for blood draw in suspected DWI violation where "[t]oo many inferences must be drawn and too many facts must be read into the affidavit in this case, which result in at most a tenuous rather than a substantial basis for the issuance of a warrant") (cleaned up).

### B. Analysis

The affidavit here does not allege any factual connection—a nexus—between the offense under investigation and any of Staley's electronic devices. The affiant says nothing more than that he believes that electronic devices and the like will be found in Staley's home (paragraph 3) and recites only "training and experience" in making generic statements about storing, syncing, searching, and analyzing digital evidence (paragraph 4). "Based upon the foregoing," the affiant then asserts that probable cause exists to "believe that the items, files and documents identified above and the material listed in paragraph #3" are "located on the premises." The affidavit's "sole purpose" is described as "to establish probable cause that a criminal offense has occurred," and the affidavit sets forth "only those facts necessary to establish

probable cause that evidence of violations of Section 22.04 of the Texas Penal Code [Injury to a Child], are located at the above address."

Notably absent is any averment that evidence of, pointing to, or somehow connected with the suspected offense might be found on or within any of Staley's electronic devices; nor does the affiant propose that "based on the foregoing," probable cause exists to seize or search the devices. Nothing more is said, really, than that computers, etc., were probably in Staley's house—an unremarkable statement in late-2010s America but a free-floating assertion altogether unconnected to the suspected crime.[13] *See Baldwin*, 664 S.W.3d at 130 (citing Tex. Code Crim. Proc. Ann. art. 18.01(c)). Even warrant affidavits containing ostensibly more in the way of the required nexus have been held insufficient to establish probable cause.

Take, for example, *State v. Garcia*, Nos. 05-22-01107-CR, 05-22-01108-CR, 2024 WL 1089477 (Tex. App.—Dallas Mar. 13, 2024, pet. ref'd) (mem. op., not designated for publication). Garcia lived at a residence from which narcotics sales were suspected. Law enforcement sought to arrest him and two others living at the address and obtained a search warrant and arrest warrants. *Id.* at *1. At the searched

---

[13]The State makes much of what it characterizes as Staley's "helpful and reasonable concession" that a magistrate could reasonably infer that his residence contained electronic devices. But the real question is not whether Staley's home contained such devices but whether the affidavit alleged a sufficient nexus between those devices and the crime being investigated to yield probable cause to search them.

premises, law enforcement discovered drugs, cash, firearms, and miscellaneous drug paraphernalia, among other things. *Id.*

Garcia moved to suppress that evidence, and both the trial and appellate courts agreed that the warrant affidavit, which described the affiant's surveillance of various comings and goings "in a manner suggesting illegal drug sales," *id.*, lacked probable cause. Our sister court noted that "[a]lthough courts may draw reasonable inferences from information clearly set forth in the affidavit, material information should not be read into the affidavit that does not otherwise appear on its face." *Id.* at *5 (citing *Cassias v. State*, 719 S.W.2d 585, 590 (Tex. Crim. App. 1986)). The *Garcia* court described the affidavit's contents:

> In the present case, the factual evidence of alleged narcotics transactions in the affidavit only confirms that, on one day, one vehicle pulled up to the house and that a different named individual [not Garcia] 'met briefly' with the occupants before the vehicle departed, and that the same thing happened twice on a different day. Although subsequent traffic stops revealed illegal drugs in each of the three vehicles, the affidavit does not contain facts that would allow the magistrate to reasonably infer a connection between the narcotics later found in the three vehicles and Garcia's premises, the location of the alleged criminal activity.

*Id.* The investigator's affidavit recited that "the named individual at the residence 'met with' the occupants of the cars. It [did] not assert that a package or money exchanged hands or otherwise was transferred into the vehicles or, alternatively, that the [cars'] occupants said they purchased drugs at the premises." *Id.* at *6. Because "[r]easonable inferences may be drawn from direct or circumstantial evidence, but not [from] bare suspicion or speculation," the affidavit "on its face lacked material information to

18

reasonably infer a connection between the discovery of narcotics in vehicles and the residence at issue." *Id.*

This was also the connection-free situation in *Baldwin*: a warrant affidavit led to the seizure and search of Baldwin's cellphone after he was arrested for traffic violations while driving a car that was associated with a recent homicide and in which the police found that phone. 664 S.W.3d at 124. Witnesses had observed two men in that car near the crime site on days before and of the murder. *Id.* To justify searching Baldwin's phone, the affiant described his investigation and stated:

> Based on your Affiant's training and experience, Affiant knows that phones and "smartphones" such as the one listed herein, are capable of receiving, sending, or storing electronic data and that evidence of their identity and others may be contained within those cellular "smart" phones. . . . Affiant believes that the incoming and outgoing telephone calls, incoming and outgoing text messaging, emails, video recordings and subsequent voicemail messages could contain evidence related to this aggravated assault investigation.
>
> Additionally, based on your Affiant's training and experience, Affiant knows from other cases he [sic] has investigated and from training and experiences that it is common for suspects to communicate about their plans via text messaging, phone calls, or through other communication applications. . . .
>
> Based on Affiant's training and experience, as well as the totality of the circumstances involved in this investigation, Affiant has reason to believe that additional evidence consistent with robbery and/or murder will be located inside the cellular telephone [as described more particularly].[14]

---

[14]Again, the affidavit in Staley's case did not say even this much.

19

*Id.* at 126–27. The court of criminal appeals held that the affidavit fell short of establishing probable cause to search Baldwin's phone; the only additional "fact" beyond boilerplate was that two men had committed the offense together—a fact insufficient to connect the phone to the offense. In short, the magistrate erred by "substituting the evidentiary nexus for the officer's training and experience and generalized belief that suspects plan crimes using their phones. The boilerplate language in itself is not sufficient to provide probable cause in this case, nor does the remaining affidavit set forth details in sufficient facts to support probable cause." *Id.* at 135.

In contrast, one of our sister courts—in a decision post-dating both *Baldwin* and *Stocker*—held sufficient a probable-cause affidavit that included not only "boilerplate language about how criminals can use cell phones," but also specific allegations about the defendant's and his cousin's texts concerning the murder victim (the defendant's wife) and the discovery of her body; the cousin's consent to the extraction of one of her phones, which revealed text messages with the defendant about removing the wife's picture from a business website; and the cousin's statement to the defendant's brother-in-law that the defendant had confessed to having accidentally killed his wife. *McDonald v. State*, No. 08-23-00133-CR, 2024 WL 3744421, at *9–10 (Tex. App.—El Paso Aug. 9, 2024, pet. ref'd) (mem. op., not designated for publication) (holding that although "the fact that there is probable cause to believe someone committed a crime is not enough to show probable cause that their phone

20

contains evidence of the crime," "[t]he information in the affidavit about Appellant and [the cousin's] known text communications about [the victim] and her murder established 'a nexus between the device and the offense' and was sufficient to show probable cause that the device would contain other communications and information about the crime").

More recently, another of our sister courts similarly held that probable cause existed to search the defendant's cellphone and its SD card where the warrant affidavit contained not only "boilerplate language about cellular phones, their usage, and the kind of fruit a forensic search might produce," but also details of what the victim's mother had relayed about her discovering the cellphone (which the defendant had left behind after moving out of her home), reviewing the contents of its SD card, and finding a thirty-eight-minute video showing the defendant sexually assaulting her eight-year-old daughter. *Johnson v. State*, No. 12-24-00135-CR, 2025 WL 356492, at *2 (Tex. App.—Tyler Jan. 31, 2025, no pet. h.); *see also Navarrete-Torres*, 2024 WL 1265389, at *8–9 (holding sufficient nexus in warrant affidavit between homicide and defendant's cellphone where affiant recounted coworker's statement to police that defendant had made work-out plans with coworker at the home shared by victim and coworker and had asked coworker to call defendant when coworker's shift ended; magistrate could reasonably infer that plans were communicated by cellphone and as pretext to determine when victim would be alone).

When we compare the affidavit in this case with ones like in *Baldwin* and contrast it with the affidavits in such cases as *McDonald*, *Johnson*, and *Navarrete-Torres*, we are compelled to conclude that the affidavit here did not establish probable cause to seize and search Staley's electronic devices.

Urging us to hold otherwise, the State would have us paper over the nexus gap with tenuous inferences, first pointing to criminal-procedure code Article 38.36(a)—a procedural provision dealing with trial evidence—which in a murder prosecution allows the State (or the defendant) to offer testimony relevant to "the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." Tex. Code Crim. Proc. Ann. art. 38.36(a). The State reasons that because Staley and Odom were in a dating relationship, the rationale behind Article 38.36(a) applies as well to the affidavit here.[15]

---

[15]Adopting this position would arguably lead to approving boilerplate affidavits for electronic devices if a murder occurred in the context of a domestic relationship, with that very circumstance—and little or nothing more—supplying the nexus. We decline to relax the Fourth Amendment's probable-cause requirements to such a degree. *Cf. Riley v. California*, 573 U.S. 373, 396–97, 134 S. Ct. 2473, 2491 (2014) ("[A] cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is."). Moreover, Article 38.36 inherently presupposes that the evidence proffered at trial was lawfully obtained. At the suppression hearing, Staley noted that Article 38.36 is a "nice rule of evidence that you deal with during a trial" to "let in information about relationship and parties," but that it "doesn't have a dang thing to do with a search warrant's sufficiency and the probable cause that would support granting a warrant."

But the search-warrant cases that the State cites in arguing that "admissibility of relationship evidence and state-of-mind evidence also impacts whether items may be seized and searched under warrants" are distinguishable: those cases involved affidavits containing details from which the magistrate could comfortably find (or infer) probable cause, decidedly unlike here. *See Sims v. State*, 526 S.W.3d 638, 644–46 (Tex. App.—Texarkana 2017) (holding that cellphone-search affidavit was supported by probable cause because it contained the affiant's belief that defendant's cellphone contained evidence of criminal activity and recited "evidence suggesting a link between Sims and Annie's murder, setting out the relationship between Sims and Annie, and information suggesting that Sims may have shot Annie"), *aff'd*, 569 S.W.3d 634 (Tex. Crim. App. 2019)[16]; *Cobb v. State*, No. 10-16-00406-CR, 2017 WL 2819106,

---

[16]In particular, that warrant affidavit recited that

> . . . cell phones are commonly used in the commission of crimes, that the cell phone in question is controlled by Sims, and that the affiant believes that Sims' cell phone contains evidence of criminal activity, such as subscriber information, text messages, voice calls, and cell-tower and GPS site coordinates. The affidavit describes Annie's death by gunshot at her residence, Annie's missing vehicle, the suspicion of the neighbor and relative that Sims may be responsible for Annie's death, specific facts from the relative leading to her suspecting Sims' involvement, a specific search of the residence uncovering the absence of Annie's vehicle, purse, and purse contents, including credit cards and guns, the use of at least one stolen credit card by Sims and Morrison in Oklahoma within hours after the murder, the tracking of Sims' cell phone location leading to authorities' location of Annie's vehicle and, ultimately, to Sims and Morrison, themselves. . . . The affidavit concludes that there is "reason to believe that information gained from" Sims' cell phone "will be useful in the investigation."

at *9–10 (Tex. App.—Waco June 28, 2017, pet. ref'd) (mem. op., not designated for publication) (concluding that probable cause supported cellphone search where affiant recited that specific offense had been committed, specifically described the property to be searched ("text messages, phone logs, and stored digital videos and images from Cobb's Samsung Galaxy III cell phone"), explained the "substantial basis for his belief that this information constituted relevant corroborated evidence of the offense committed," and stated his belief "that the said cell phone will contain communications between" defendant and victim, "as well as communication between [defendant] regarding the crime committed").[17] Here, in contrast—and assuming

_____

*Id.* at 645. That's a significant amount of nexus.

[17]The State also cites us to *Reeves v. State*, 969 S.W.2d 471 (Tex. App.—Waco 1998, pet. ref'd), in which the defendant was convicted of murdering his wife, but its usefulness is limited. In *Reeves*, the evidence to which the defendant objected—"a check to his divorce attorney, a check to a carpet installer, a 'Lonely Hearts' advertisement, a Filipino marriage contract, and a form letter to a pen pal club," *id.* at 480—and which had been in plain view when law enforcement executed a valid search warrant, was "properly seized" even though not listed in the warrant, *id.* at 486. There was "no dispute that the evidence was discovered and seized in the course of a good[-]faith search conducted within the parameters of a valid search warrant"; "the evidence was reasonably related to the offense under investigation, and the officer seizing the evidence had a reasonable basis for drawing the connection between the evidence observed and the crime." *Id.* That "reasonable basis" derived from the officers' knowledge of the defendant's relationship with the victim, from which they "could reasonably conclude that marriage contracts, checks to a divorce attorney, 'pen pal' letters, and personal ads for 'companionship' would shed light on that relationship," not to mention the fact that because the warrant authorized seizing carpet samples, "the check for carpet installation could reasonably be considered evidence that [the defendant] replaced the old carpet to dispose of incriminating evidence." *Id.* Seizing reasonably related materials that are in plain sight while executing a search warrant is not the same as getting inside electronic devices that—

24

without deciding that the Fourth Amendment can be informed by Article 38.36—the affidavit lacks any averment that searching Staley's electronic devices would likely produce useful evidence of the home's occupants' relationship or Staley's state of mind, much less of the crime being investigated.

But the State proposes that Odom's having "forwarded" to a detective the early September photo depicting Wilder's facial bruising showed probable cause to search Staley's electronic devices based on (a) an inference that Odom and Staley communicated by cellphone or other means, especially when discussing Staley's caring for a toddler while Odom was at work, possibly revealing any resulting stress on Staley, (b) an inference that the September incident constituted child abuse, and (c) the boilerplate affidavit statement that electronic data can be synced to other devices, intentionally or unintentionally.[18] Although we have no problem with a magistrate's

_____

although the devices might be plainly visible—do not by their mere existence suggest any connection with the crime at issue.

[18]Other of the affiant's recitations to which the State points in arguing that the totality of the circumstances showed probable cause either do not say what the State contends they do or they shed no light on information that might allegedly be unearthed by searching electronic devices. For example, the State characterizes the affidavit as establishing that Staley and Odom had a "volatile dating relationship," that there was "a likely prior incident of child abuse," and that a "tumultuous relationship" was shown by Odom's having left Staley's house but returning the next day, less than a week before Wilder's death. But the affidavit's actual, anodyne language simply does not support the State's editorializing. ("Amber and James indicated they were in a dating relationship at this time." "[O]n a previous date on or about 08/31/2018 while she was at work and while James Staley was caring for Wilder, she discovered bruising on Wilder's face the morning of 09/01/2018. Amber was told by James that Wilder fell off a bed and hit his head. Amber took a photo at the time, and she forwarded it

inferring that Odom's "forwarding" the photograph suggests that she probably took it on her cellphone in the first place and then passed it along, also by cellphone, to the detective, under the Fourth Amendment that logical inference cannot yield downstream inferences that her phone was synced with Staley's electronic devices and that his devices might "contain relationship evidence and state-of-mind evidence material to the murder investigation," as the State contends but as the affidavit does not say or imply.

And we disagree with the State's reliance on *Foreman v. State* in arguing for comparable "reasonable inferences and common knowledge" that were recognized in that case. 613 S.W.3d 160, 166 (Tex. Crim. App. 2020). In *Foreman*, the court of criminal appeals—conceding that it faced a "close case," *id.* at 167—held that reasonable inferences from the affidavit supported the resulting warrant authorizing the seizure of "surveillance video and/or video equipment" from "Dreams Auto Customs," a business at which a torture and robbery had occurred, even though the

_____

to Detective Nelson. Detective Nelson observed bruising on Wilders' face. Amber indicated she had been staying at James' residence at the time, but later moved out on or about 10/06/2018 then began staying there again on 10/07/2018.") Likewise, what the State describes as "the disparate reactions of Staley and Odom to Wilder's death"—based on the affidavit's observations that Odom was "extremely upset" and that Staley "stayed in the hallway or inside his closet most of the time and would not go anywhere near Amber or Wilder"—might arouse suspicions, but they imply nothing about why searching Staley's electronic devices might help the investigation.

affidavit itself said nothing about surveillance video or equipment.[19] *Id.* at 162. Rather, the affidavit recited that the business to be searched was within a "single story building complex," was "made of metal and brick with dark tinted glass windows and black painted aluminum," had a front door with "dark tinted glass" facing the parking lot, and had a rear entry with "an aluminum looking, gray in color bay door that opens into the business." *Id.*

The court of criminal appeals concluded that, from the affidavit's contents, the magistrate could reasonably infer that the business dealt with money, was concerned with security as evidenced by the tinted windows, probably customized automobiles on site ("uniquely mobile and highly valuable tangible goods") because of the back-bay entrance, and inferentially "needed to be able to keep an eye on the interior of the business." *Id.* at 166–67. It was thus "logical for the magistrate to infer that to the degree of certainty associated with probable cause, the business was equipped with a video surveillance system." *Id.* at 167. Here, though, we cannot agree that the magistrate—faced with an affidavit that did not even articulate an expectation that something on Staley's electronic devices might shed light on Wilder's death—could properly infer the kind of inference (barely) approved in *Foreman*.

Nor does the State's discussion of a Massachusetts domestic-homicide case convince us. *Commonwealth v. Fernandes*, 148 N.E.3d 361 (Mass. 2020). *Fernandes*

---

[19]Foreman moved to suppress surveillance video that had recorded the events for which he was charged and convicted. *Id.* at 162.

involved an unsuccessful probable-cause challenge to a warrant authorizing the search of a digital camera found in the home in which Fernandes had admitted to having murdered his girlfriend. *Id.* at 365–66. Although superficial comparisons can be drawn, the affidavit in *Fernandes* contained far more in the way of facts supporting probable cause to seize and search the digital camera:

- Fernandes had a pending charge of assault and battery against his girlfriend.

- Right after the murder, Fernandes went to a bar and told another patron that his girlfriend was dead in his apartment and that he would soon be in the news.

- Following a traffic stop, Fernandes spontaneously asked if the stop concerned his girlfriend and gave the police consent to search his apartment, where they discovered the body.

- During the resulting interview, Fernandes confessed to killing his girlfriend, described wrapping her body in a blanket and placing it in a back room, and told police that after the murder, he had called his dead girlfriend's cellphone from his cellphone and left a message.

*Id.* at 370–71. These facts combined to support an inference that the digital camera might "contain evidence relevant to the nature of their relationship, the defendant's motive for the killing, and possibly the killing itself." *Id.* at 373. Those facts are not these facts.

Because the search-warrant affidavit here did not establish probable cause for the seizure and search of Staley's electronic devices—and because holding otherwise could be interpreted as approving law enforcement's seizing and searching someone's electronic devices simply because they exist, a notion inconsistent with the

28

constitutional protections enshrined by our founders—we sustain that aspect of his first issue.

## VI.

## Preservation of Objections to Electronic-Device Evidence

The State argues that Staley preserved a challenge only to the Mac Mini and the GoPro video[20] and forfeited any appellate complaint about evidence from his laptop or cellphone.

Although Staley's focus in his suppression motion and at the suppression hearing was on the Mac Mini and video, we cannot agree that the trial court's ruling and grant of a running objection covered only that electronic device.[21] In addition, the

---

[20]Toward the end of its case in chief, the State also asked the trial court "out of prudence" to supplement its suppression-motion ruling by finding that the seizure of the Mac Mini fell within the plain-view doctrine, contending that (a) probable cause existed to search for clothing that was found in a closet and (b) the Mac Mini was in plain sight on a desk inside the closet. The trial court declined to do so, remarking that it did not believe that an "expansion" of its ruling was necessary and expressing the view that "the item [was] seized in accordance with the [magistrate's] order and a good faith reliance by the officer upon that." *See also* n.9, *supra*.

[21]We earlier detailed the various comments and argument that showed a wider universe of devices subject to Staley's suppression motion. *See* Sec. III & n.10, *supra*. Additionally, although the State finds it significant that Staley's suppression motion and argument at the hearing referred to "electronic devices generally" but "focused on the Mac Mini and a video from that device," it cites no authority holding that, where various evidence from multiple types of electronic devices is sought to be suppressed, drawing a particular device to the trial court's attention or being extra-careful at trial to renew a preserved objection to that one device somehow jettisons preserved objections to the others.

fact that Staley carefully reurged his Mac Mini objection at trial does not mean that he needed to do so for other electronics evidence—although several times he did.[22]

## A. Applicable law

To preserve a complaint for our review, a party must have presented a timely request, objection, or motion to the trial court, stating the specific grounds for the desired ruling if not apparent from the context. Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021); *Thomas v. State*, 408 S.W.3d 877, 884–85 (Tex. Crim. App. 2013) (explaining that "the reason that any objection must be specific in the first place is so that the trial court can avoid the error or provide a timely and appropriate remedy, and the opposing party has an opportunity to respond and, if necessary, react"); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial. In making this

---

[22]When the State questioned a Wichita Falls detective about his collecting Staley's devices when executing the October 22, 2018 warrant, the detective identified the Mac Mini, "GoPros, storage devices, thumb drives, just different storage items, cell phone" as "computer devices" taken under the warrant. Staley interjected, "Judge, again, just in the interest of the record, I will be renewing our objection made at our pretrial with regard to *these items*. I take it your ruling would be the same, am I correct, sir?" [Emphasis added.] The trial court responded, "The ruling's the same." Earlier, when photographs of the Mac Mini were discussed, Staley reminded the trial court of his pretrial suppression motion concerning the warrant's "having no probable cause to support a seizure of *any electronic devices* or GoPro or anything of the sort." [Emphasis added.] "I'm not waiving anything objection [sic] preserved at pretrial with regard to the search for *the items* outside the scope of what was the probable cause set forth in search[-]warrant affidavit." [Emphasis added.]

determination, we consider the context in which the complaint was made and the parties' shared understanding at that time.").

After a trial court has denied a pretrial suppression motion—which alone suffices to preserve error without a defendant's needing to object at trial, *see* Tex. R. Evid. 103(b)—if the defendant affirmatively expresses at trial that he has no objection to the evidence, he *generally* forfeits any complaint about its admission. *E.g.*, *Thomas*, 408 S.W.3d at 884 ("Our case law makes it clear that a statement of 'no objection' when the complained-of evidence is eventually proffered at trial—at least, without more—will signal to the trial court an unambiguous intent to abandon the claim of error that was earlier preserved for appeal."); *Estrada v. State*, 313 S.W.3d 274, 301–02 (Tex. Crim. App. 2010); *Upchurch v. State*, 656 S.W.3d 170, 176–77 (Tex. App.—Fort Worth 2022, no pet.) (holding forfeiture due to appellant's "no objection" response to State's offer of certain extraneous-offense evidence).

We say "generally" because the court of criminal appeals has recognized that whether stating "no objection" forfeits the complaint for appeal is, like all preservation issues, "context-dependent." *Thomas*, 408 S.W.3d at 885. We are not to focus on a "no objection" statement in isolation but rather must consider it within the context of the entire record.[23] *Id.* If that record "plainly demonstrates that the defendant did not intend, nor did the trial court construe, his 'no objection' statement

---

[23]We have, as required, reviewed the entire record, but we note that our review would have been considerably aided by more robust record citations in the briefing.

to constitute an abandonment of [an earlier preserved] claim of error," then we are not to treat the complaint as waived. *Id.* But if, from the whole record, we "simply cannot tell whether an abandonment was intended or understood," we are to "regard the 'no objection' statement to be a waiver of the earlier-preserved error," and the statement "will, by itself, serve as an unequivocal indication that a waiver was both intended and understood." *Id.* at 885–86.

We so held in *Upchurch*, where we could not tell from the record as a whole whether the appellant intended or the trial court understood his "no objection" statements as abandoning his earlier objection to certain extraneous-offense evidence. 656 S.W.3d at 176–79 (holding that although appellant objected at trial to photographs of his hospitalized burn victim, thus preserving that specific complaint, he forfeited objections to admission of her medical records and photographs of the gas can, torch, and car involved in the earlier aggravated assault by stating "no objection"); *see also Ortega v. State*, No. 02-17-00039-CR, 2018 WL 6113166, at *2 (Tex. App.—Fort Worth Nov. 21, 2018, no pet.) (mem. op., not designated for publication) (holding that appellant forfeited complaint raised in suppression motion by affirmatively stating "no objection" to transcript of audio-recorded conversation with law enforcement); *cf. Chavez v. State*, No. 04-23-00777-CR, 2024 WL 5151172, at *5 (Tex. App.—San Antonio Dec. 18, 2024, pet. ref'd) (mem. op., not designated for publication) (holding that appellant's "no objection" statement was not intended to, nor did trial court construe it as meant to, abandon pretrial suppression motion

where, during bench conference mid-trial, appellant renewed objection and asked trial court to reconsider its ruling on suppression motion, and trial court stated that objection was "overruled and denied for the record").

**B. Evidence from Staley's laptop: objection preserved**

Because of the trial court's suppression-motion ruling, when the State presented evidence at trial that Staley had downloaded and run CCleaner on his laptop, Staley had no need to object. *See* Tex. R. Evid. 103(b). The State is thus wrong to suggest that Staley forfeited his pretrial objection to the CCleaner evidence by not objecting at trial.

**C. Evidence from Staley's cellphone: objection partly preserved**

The State introduced essentially two categories of evidence from Staley's cellphone: videos and text-based messages. As we will explain, we conclude that Staley did not forfeit his preserved objection by stating "no objection" to the videos extracted from his cellphone because the context of the entire record "plainly demonstrates" that Staley "did not intend, nor did the trial court construe, his 'no objection' statement to constitute an abandonment of [his preserved] claim of error" concerning video evidence. *Thomas*, 408 S.W.3d at 885. But we conclude differently when it comes to text-message evidence from the cellphone; his "no objection" responses to those exhibits' introduction into evidence were not so clear in their effect.

The State refers us to a number of Staley's "no objection" statements relating to evidence from his cellphone. We first address State's Exhibit 156, the extracted videos.

Before any videos—from any device—were admitted and played for the jury, a lengthy discussion took place about the GoPro video (State's Exhibit 154, which was the first one the jury saw) and the related cellphone videos (Exhibit 156). Outside the jury's presence, the State played both exhibits for the trial court so that it could rule collectively on Staley's motion to exclude this extraneous-offense evidence as more prejudicial than probative. The trial court agreed that the exhibits "go together" and, after viewing them, held that the probative value of the evidence was not substantially outweighed by a danger of unfair prejudice. The trial court further agreed to (and did) give the jury limiting instructions at the appropriate times. Staley obtained the trial court's confirmation that his objections were overruled and stated, "And then Judge, under [Rule of Evidence 103(b)], when and if that is heard by the -- the Jury, . . . there would be no necessity of renewing the objection in order to preserve that claim, we'll have a running objection, every aspect of it, as to both videos." The trial court permitted the running objection and confirmed that its "ruling will be the same."

We conclude that, in the context of the entire record, the trial court clearly understood that Staley did not mean to abandon—and was not abandoning—his objection to the cellphone videos when, before they were published, Staley said "no

objection" in response to the trial court's question, "I understand State's Exhibit 156 has been offered or tendered?" *See id.* at 884.

But concerning the bulk text-message exhibit (Exhibit 149) and separate demonstratives taken from within it (Exhibits 500–533), as well as other exhibits excerpted from those "thousands of pages of text messages" (Exhibits 138–148), we conclude that Staley's repeated "no objection" statements waived any objection concerning that evidence.[24] Unlike the videos from the GoPro and the cellphone, our review of the record does not reveal that Staley's "no objection" statements were similarly accompanied by any contemporaneous or even previous reminders to the trial court or the State that his suppression motion had covered this evidence. Because we "simply cannot tell whether an abandonment was intended or understood," we "regard the 'no objection' statement to be a waiver of the earlier-preserved error." *Id.* at 885–86; *see also Upchurch*, 656 S.W.3d at 176–79.

---

[24]Staley argues that his "no objection" statement to Exhibit 149 was meant only to acknowledge that the State had linked up its conditional admission from the day before, positing that he was not waiving an objection to the constitutionally illegal search "but was waiving any objection to the prosecution's linking up of the evidence" in accordance with evidentiary rule 104(b). *See* Tex. R. Evid. 104(b). But Staley did not draw this distinction to the trial court's attention, nor did he respond or push back against the trial court's then stating that "State's Exhibit 149 is finally admitted for all purposes." *See Wright v. State*, No. 08-20-00056-CR, 2021 WL 1556661, at *8 (Tex. App.—El Paso Apr. 20, 2021, no pet.) (not designated for publication) (holding that defendant's affirmative "no objection" statements at trial waived earlier running objection to same evidence and collecting cases).

## VII. Harm

Having concluded that the trial court should have granted Staley's motion to suppress on Fourth Amendment grounds, we must analyze whether that error was harmless.

We review constitutional error under Rule 44.2(a). *See State v. Roberts*, 2024 WL 3364045, at *3 (Tex. App.—Waco July 11, 2024, pet. ref'd) ("When a trial court erroneously denies a motion to suppress and admits evidence obtained in violation of the Fourth Amendment, the error is constitutional and subject to the harmless-error analysis under Rule 44.2(a)." (citing *Dixon v. State*, 595 S.W.3d 216, 225–26 (Tex. Crim. App. 2020) (Hervey, J., concurring)); *Leleo v. State*, Nos. 01-20-00034-CR, 01-20-00035-CR, 2022 WL 243917, at *31 (Tex. App.—Houston [1st Dist.] Jan. 27, 2022, no pet.) (mem. op., not designated for publication) (same, and citing *Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001)).[25] Under this

---

[25]The State urges us to apply the relaxed nonconstitutional-error analysis under Rule of Appellate Procedure 44.2(b) (requiring us to disregard error that does not affect a defendant's substantial rights) as opposed to the more stringent constitutional-error analysis of Rule 44.2(a) (calling for us to reverse a conviction unless we determine "beyond a reasonable doubt that the error did not contribute to the conviction or punishment"). *See* Tex. R. App. P. 44.2(a), (b).

The State points us to the trial court's comment about law enforcement's "good faith reliance" on the search warrant during the back and forth over the State's request toward the end of trial for a supplemental finding that the Mac Mini was appropriately seized under the plain-view doctrine. *See* n.20, *supra*. From that, the State would have us analyze harm under Article 38.23 of the Texas Code of Criminal Procedure, which the court of criminal appeals has held requires Rule 44.2(b) nonconstitutional-error review. *See* Tex. Code Crim. Proc. Ann. art. 38.23; *Holder v.*

36

type of review, "[i]f there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000); *see also Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008).

Our harmless-error analysis should not focus on the propriety of the trial's outcome—that is, whether the jury verdict was supported by the evidence. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). Instead, we determine the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations—in other words, whether the error adversely affected "the integrity of the process leading to" the conviction. *Id.*; *see also Wesbrook*, 29 S.W.3d at 119 ("[T]he appellate court should calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence.").

We "should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt the error did not contribute to the conviction or punishment.'" *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting Tex. R. App. P. 44.2(a)). While

---

*State*, 639 S.W.3d 704, 705–07 (Tex. Crim. App. 2022). But the appellant in *Holder* "did not even invoke the Fourth Amendment on appeal," going instead with the Texas Constitution, which in turn depends on Texas's statutory exclusionary rule to remedy any violation. *Id.* at 707. The court thus held that Rule 44.2(b) was "the appropriate harm analysis when only a violation of Article 38.23 is involved." *Id.* Here, Staley invoked only the Fourth Amendment and not Article I, Section 9, of the Texas Constitution, which is our state counterpart to the Fourth Amendment, nor Article 38.23, so *Holder* is not apropos.

the most significant concern must be the error and its effects, the presence of overwhelming evidence supporting the finding in question can be a factor in evaluating harmless error. *Wesbrook*, 29 S.W.3d at 119. Other factors to consider may include, if applicable, the nature of the error, the extent that the State emphasized it, its probable collateral implications, and how a juror would probably weigh the error. *Snowden*, 353 S.W.3d at 822. This harmless-error test requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not in the light most favorable to the prosecution. *Balderas v. State*, 517 S.W.3d 756, 810 (Tex. Crim. App. 2016) (Alcala, J., dissenting).

After carefully reviewing the record and performing Rule 44.2(a)'s required harm analysis, we cannot determine beyond a reasonable doubt that the error in not suppressing the video evidence did not contribute to Staley's conviction. *See* Tex. R. App. P. 44.2(a); *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). The GoPro video alone would elicit a visceral reaction in anyone, and the State used it to great effect, from its opening-statement foreshadowing ("I'm sorry that this video exists. I'm sorry that I have to tell you about it. And I'm sorry that you're gonna have to see it because y'all -- you're never gonna unsee it.") to suggesting its especially heinous nature when questioning the forensic witness through whom it had just been introduced and played for the jury ("Q. Do you examine a lot of devices with a lot of disturbing videos? A. Yes, sir. Q. And did that one stand out in your mind?"). And the State's rebuttal closing argument repeatedly emphasized the GoPro video:

38

- "First I told you I was sorry that you had to see it, and second I told you we weren't bringing it to you to prove that he killed Wilder. We were bringing it to prove what's in his hear[t] as direct evidence of what's in his heart."

- "And here's what you know from watching that horrible, horrible video -- and just like [the State's co-counsel] told ya, I'm not gonna show you the video again, I can't do that to you. I got about one more day of that video in me and I'm [n]ot gonna show it to you."

- "But here's the thing that's most important. God, I'm sorry to do this to ya. I'm not gonna show you the video, but there's something about that video that's really, really important where this is concerned."[26]

- "He staged that child on that crib and he had thought about it in advance and he edited that [GoPro] video because it was all the proof he needs [to create a history of alleged falls]."

True, the State presented and argued other evidence of Staley's guilt beyond what the improper search of his electronic devices revealed, but that evidence was not "overwhelming," *Wesbrook*, 29 S.W.3d at 119, and the GoPro video is shocking, its impact undeniable. It is difficult—impossible, really—for us to imagine that it was not a contributing factor in the jury's deliberations. *See Scott*, 227 S.W.3d at 690–91. That seems particularly true because of the circumstantial nature of the other evidence, not

---

[26]The State then proceeded to play just the audio from the GoPro video.

to mention that the autopsy report showed Wilder's cause of death as "undetermined." The trial court's failure to grant Staley's motion to suppress it (and the related cellphone videos) was not harmless error.

## VIII. Conclusion

Having sustained Staley's first issue as it relates to the lack of probable cause for the seizure and search of his electronic devices, and thus not needing to reach his other issues, we reverse his conviction and remand this case for further proceedings in the trial court consistent with this opinion.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Publish

Delivered: March 6, 2025

40